Joseph JONES, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 115, 1998.

Supreme Court of Delaware.

Submitted: June 22, 1999.

Decided: Dec. 16, 1999.

John S. Malik, Wilmington, Delaware, for Appellant.

Timothy J. Donovan, Jr., Deputy Attorney General, Department of Justice, Wilmington, Delaware, for Appellee.

Before VEASEY, C.J., WALSH, HOLLAND and HARTNETT, JJ., JACOBS, Vice Chancellor,* constituting the Court en Banc.

VEASEY, Chief Justice:

In this criminal appeal, we reverse the judgment and sentence of the Superior Court because evidence was invalidly seized from the defendant. The seizure resulted from an encounter with a police officer in which the officer, based only on an anonymous 911 call that there was a "suspicious black male wearing a blue coat" in a particular vicinity, ordered the defendant to stop and remove his hands from his pockets. As a result of this stop,

cocaine was seized. To stop and detain an individual pursuant to the Delaware detention statute and the Delaware Constitution, a peace officer must have a reasonable and articulable suspicion of criminal activity. The information possessed by the officer in this case did not rise to that level. As a consequence, the search was invalid and the evidence inadmissible.

### Facts

Shortly before 10:00 p.m. on February 11, 1997, the New Castle County Police Department received a 911 call reporting that a "suspicious black male wearing a blue coat" had been standing for some time in front of 98 Karlyn Drive in the Garfield Park area of New Castle County. The caller provided no other information, and the 911 operator failed to record the name of the caller. At approximately 9:53 p.m., Patrolman Clay Echevarria of the New Castle County Police Department was in uniform on routine car patrol of the Garfield Park area with his partner when he received a radio dispatch relaying the 911 complaint and no other information. Within three minutes of receiving the dispatch, Patrolman Echevarria and his partner arrived in the vicinity of the address referred to in the 911 call. The officers did not notice anyone in front of, or near, 98 Karlyn Drive. After circling the block, the officers drove past the area again. This time they noticed two black males standing on the sidewalk in front of 85 Karlyn Drive, approximately four houses from 98 Karlyn Drive. One of them (the defendant Joseph Jones) was wearing a blue coat and had his hands in his coat pockets.

Patrolman Echevarria testified that he did not see either individual engaging in suspicious activity. He also testified that he was very familiar with Garfield Park and its reputation as a high crime, high

* Designated pursuant to Art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4.

drug area. Although he knew many of the "regular" drug-dealers in the area, he testified that he did not recognize Jones as a person known to be involved in illegal activity.

Patrolman Echevarria parked his patrol car, exited the vehicle and approached Jones. He did not first ask Jones to state his name, address, business abroad or destination as required by the detention statute, 11 *Del. C.* § 1902.[1] As we interpret the record developed at the suppression hearing in the Superior Court, the officer ordered Jones to stop and remove his hands from his coat pockets.[2] Jones did not comply with the order. He turned and began walking away from the officers.[3] After ordering Jones three times, without effect, to remove his hands from his coat pockets,[4] Patrolman Echevarria grabbed Jones' hands in an attempt to remove them from the coat pockets, at which time Jones threw an object over the officer's head. A struggle then ensued. After subduing and handcuffing Jones, the officers

recovered the thrown object, a small bag containing a substance later determined to be cocaine. A further search of Jones' person and the vicinity of 85 Karlyn Drive resulted in the seizure of more cocaine and paraphernalia (a scale) commonly used in illicit drug transactions.[5]

### Proceedings in Superior Court

Jones was indicted on one count of Trafficking in Cocaine in violation of 16 *Del. C.* § 4753A(a)(2)(a), one count of Possession with Intent to Deliver Cocaine in violation of 16 *Del. C.* § 4751, one count of Possession of Drug Paraphernalia in violation of 16 *Del. C.* § 4771, and one count of Resisting Arrest in violation of 11 *Del. C.* § 1257.

In the Superior Court, Jones moved to suppress all evidence seized during the February 11, 1997, encounter. The hearing on the motion included live testimony from Jones and Patrolman Echevarria. The State contended that, even if the officers lacked reasonable suspicion, the police conduct was proper on the following theo-

---

1. Section 1902 states:
 (a) A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination.
 (b) Any person so questioned who fails to give identification or explain the person's actions to the satisfaction of the officer may be detained and further questioned and investigated.
 (c) The total period of detention provided for by this section shall not exceed 2 hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be. arrested and charged with a crime.

2. On direct examination the officer testified, "As I approached him, he was trying to walk away from me, and I asked him not to go anywhere." During cross examination, the following exchange took place:
 Jones' counsel: And upon your vehicle pulling up, the individual in the blue coat and the other individual remained where they were in the vicinity of this property 85 Carlin [sic] Drive?

Echevarria: The other person complied and stayed still. The other individual [Jones] started walking away towards Chesterfield away from 85.

\* \* \*

Jones' counsel: I take it ... that upon your pulling up and getting out of your car, he was not free to leave the area. In other words, he couldn't keep on walking and you would say, "Okay, no problem, I'm just going to let you go"?
Echevarria: No. I would hope he wouldn't leave, but no, he wasn't free to leave.
Jones's Counsel: At that point in time, would you agree that you were attempting to effectuate a pedestrian stop?
Echevarria: Yes, sir.

3. Patrolman Echevarria testified that he was surprised Jones started to walk away because "nine out of ten times" when "we make contact with someone" in that area, at that time of night, "they would run."

4. Echevarria testified that officer safety concerns prompted his focus on getting Jones to remove his hands from his coat pockets.

5. The scale apparently fell out of Jones' pocket/jacket during the struggle with the officer.

ry: By ordering Jones to remove his hands from his coat, Patrolman Echevarria was attempting to ensure the safety of himself and his partner. In fact, the State emphasized that it was not arguing that Patrolman Echevarria possessed reasonable and articulable suspicion before stopping Jones.[6]

The Superior Court denied Jones' motion to suppress. In doing so, the Court specifically rejected both parties' interpretations of the facts, finding instead that Patrolman Echevarria possessed sufficient reasonable suspicion of Jones' criminal activity to stop and detain Jones.[7]

Based on the Superior Court's denial of his motion to suppress, Jones entered into a stipulated trial agreement with the State whereby he waived his trial rights and admitted guilt while nevertheless preserving his right to appeal all aspects of the Superior Court's decision. Jones filed a timely appeal in this Court, and we now consider his arguments, both factual and legal, on the validity of the search and the

admission into evidence of the fruits of that search.

### The Analytical Framework

A trial court's determination whether a peace officer possessed reasonable and articulable suspicion to detain an individual is an issue of law and fact.[8] Here, there are no disputed issues of fact. Therefore, this Court reviews *de novo* the Superior Court's alleged errors in formulating and applying the law.[9]

An individual's right to be free of unlawful searches and seizures in Delaware is secured by two independent, though correlative sources. The Fourth Amendment to the United States Constitution guarantees to individuals the right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[10] In similar language,[11] Article I, § 6 of the Delaware Constitution guarantees that the people of the State of Delaware "shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures."[12] This

---

6. In the State's reply argument at the suppression hearing, the prosecutor admitted: "I don't want to say it's reasonable articulable suspicion, but it's proper police conduct under the circumstances in this particular case and I don't think the evidence should be suppressed."

7. The Court rejected the State's argument that Patrolman Echevarria was justified in ordering Jones to remove his hands from his coat even absent reasonable suspicion:

> The logical extension of [the State's] interpretation ... would be that anybody on the street with their hands in their pockets, the officer could walk up and tell them to take their hands out, and if they don't, obviously what entailed here can take place. I think you need ... reasonable suspicion, but I find it ... fairly clearly here.

8. *See Downs v. State*, Del.Supr., 570 A.2d 1142, 1144 (1990).

9. *See State v. Maxwell*, Del.Supr., 624 A.2d 926, 928 (1993).

10. U.S. Const. amend. IV. The Fourteenth Amendment makes the Fourth Amendment applicable to the states. *See Mapp v. Ohio*,

367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

11. *See Rickards v. State*, Del.Supr., 77 A.2d 199, 204 (1950).

12. Del. Const. art. I, § 6. This provision of the 1897 Delaware Constitution was found originally in Delaware's Constitution of 1792, which "borrowed heavily from" Pennsylvania's revised Declaration of Rights of 1790— itself a precursor to the federal Bill of Rights enacted in 1791. Rodman Ward, Jr. & Paul J. Lockwood, *Bill of Rights: Article I, in The Delaware Constitution of 1897: The First One Hundred Years* 75, 77 (Randy J. Holland & Harvey Bernard Rubenstein, eds., Delaware State Bar Ass'n 1997). Delaware's decision to revise its Bill of Rights in 1792 probably was influenced also by the adoption of the federal Bill of Rights in 1791. *See id.* at 76–77. Nevertheless, state declarations of rights were the primary origin and model for the federal Bill of Rights. *See* Randy J. Holland, *State Constitutions: Purpose and Function, in The Delaware Constitution of 1897, supra,* at 12.; *see also Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 475, 142 L.Ed.2d 373 (1998) (Scalia, J., concurring) ("Like most of the

Court has never decided whether, and in what situations, Article I, § 6 of the Delaware Constitution should be interpreted to provide protections that are greater than the rights accorded citizens by the Fourteenth Amendment as it has been interpreted by the United States Supreme Court.[13] The defendant here contends that federal and state constitutional guarantees as well as the officer's failure to comply with 11 *Del. C.* § 1902 constitute separate and independent grounds supporting reversal of his conviction.

■ In *Terry v. Ohio*,[14] the United States Supreme Court held that a police officer may detain an individual for investigatory purposes for a limited scope and duration, but only if such detention is supported by a reasonable and articulable suspicion of criminal activity.[15] We have defined reasonable and articulable suspicion as an "officer's ability to 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.' "[16] A determination of reasonable suspicion must be' evaluated in the context of the totality of the circumstances as viewed

through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts.[17] Delaware has codified this standard for investigatory stops and detentions in 11 *Del. C.* § 1902. For the purpose of this analysis, "reasonable ground" as used in Section 1902(a) has the same meaning as reasonable and articulable suspicion.

### When the Stop Occurred

■ The question of when a seizure has occurred is perhaps the most critical issue. The State contends that Jones' failure to stop and remove his hands from his coat is an independent factor supporting the seizure, based on the fact that Jones started walking away and ignored the Officer's orders before he was seized. We assume arguendo, but need not decide, that if a person attempts to flee before being seized, the court may consider the attempt to flee, and any information derived therefrom, as one factor in deciding whether a police officer had an articulable basis for effecting the seizure.[18] But, in our view, if

provisions of the Bill of Rights, the Fourth Amendment was derived from provisions already existing in state constitutions."); *Claudio v. State*, Del.Supr., 585 A.2d 1278, 1290–98 (1991) (focussing on the Delaware and federal rights to trial by jury).

13. *See Sanders v. State*, Del.Supr., 585 A.2d 117, 145 (1990) ("[T]he United States Constitution establishes a minimum, the least protection that a State may provide to its citizens without betraying our heritage of democratic yet limited government. It does not establish a maximum; indeed, it could not without destroying the basic tenets of federalism.").

14. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

15. *See id.* at 21, 30, 88 S.Ct. 1868.

16. *Coleman v. State*, Del.Supr., 562 A.2d 1171, 1174 (1989) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868).

17. *See United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981);

*Quarles v. State*, Del.Supr., 696 A.2d 1334, 1337, *cert. denied*, 522 U.S. 938, 118 S.Ct. 349, 139 L.Ed.2d 271 (1997).

18. For example, the Connecticut Supreme Court specifically distinguished a situation in which an individual fled before a seizure from one in which the individual fled after a seizure. *See State v. Groomes*, 232 Conn. 455, 656 A.2d 646, 653 (1995) ("[T]he defendant's flight in this case properly could be considered in determining whether there existed a reasonable and articulable basis of suspicion, because the defendant began to flee before the police attempted to stop him."); *see also United States v. Sharpe*, 470 U.S. 675, 682 n. 3, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (noting that evasive action upon being followed by a police car constitutes an element of reasonable suspicion); *Sibron v. New York*, 392 U.S. 40, 66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ("[D]eliberately furtive actions and flight at the approach of ... law officers are strong indicia of *mens rea*."); *State v. Jackson*, 147 Wis.2d 824, 434 N.W.2d 386, 390–91 (1989) (stating that flight upon observing squad car afforded officer reasonable suspicion).

the seizure preceded the attempt to flee, that attempt or any information derived therefrom, is not a proper factor in assessing the validity of a seizure.

In *Terry*, the United States Supreme Court held that a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty" of the individual.[19] In *INS v. Delgado*,[20] the Court refined this standard to mean that a seizure has occurred only " 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' "[21] The Court further refined this standard in *Michigan v. Chesternut*[22] by focusing not on whether a reasonable person would feel free to leave but on whether the officer's conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."[23]

In 1991, however, the United States Supreme Court carved out a controversial exception to the *Chesternut* standard in its interpretation of the rights guaranteed by the Fourth Amendment. In *California v. Hodari D.*,[24] the United States Supreme Court held that, even when an officer has manifested a "show of authority," a seizure within the meaning of the Fourth Amendment further "requires *either* physical force ... *or*, where that is absent, *submission* to the assertion of authority."[25] The majority in *Hodari D.* found that the *Chesternut* standard states only "a *necessary*, but not a *sufficient*, condition for seizure ... effected through a 'show of authority.' "[26] Thus, the majority in *Hodari D.* found that a show of authority by itself, even if it would cause a reasonable person to believe that he or she was not free to leave, is not alone sufficient for a seizure giving rise to the protections provided by the Fourth Amendment.

In *Hodari D.*, two police officers in an unmarked car rounded a corner and observed several youths "huddled around a small red car parked at the curb. When the youths saw the officers' car approaching they apparently panicked, and took flight."[27] Their suspicion aroused, the officers separated to chase the youths, who went in different directions. One officer caught up with Hodari, who tossed away what turned out to be crack cocaine just before being tackled by the officer. The state conceded that the officers had lacked reasonable and articulable suspicion to stop Hodari simply upon seeing him run. The officers had not said or done anything to make the juveniles reasonably believe that they were not free to leave. The Court held that because Hodari was not seized until tackled, the discarded crack cocaine was admissible.[28]

19. 392 U.S. at 19 n. 16, 88 S.Ct. 1868.

20. 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). ·

21. *Id.* at 215, 104 S.Ct. 1758 (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)). Justice Stewart wrote the majority opinion in *Mendenhall*, but only Justice Rehnquist joined that part of the decision defining when a seizure occurs. Although the Court also incorporated most of this language in *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), an earlier plurality opinion, *Delgado* was the first majority opinion incorporating that language.

22. 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

23. *Id.* at 569, 108 S.Ct. 1975; *see also Quarles v. State,* Del.Supr., 696 A.2d 1334, 1337

(1997); *Robertson v. State,* Del.Supr., 596 A.2d 1345, 1351 (1991).

24. 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

25. *Id.* at 626, 111 S.Ct. 1547 (emphasis in original).

26. *Id.* at 628, 111 S.Ct. 1547 (emphasis in original).

27. *Id.* at 622–23, 111 S.Ct. 1547 (footnote omitted).

28. A similar fact pattern arose in a case before this Court in 1994. In *Gholdson v. State,* Del.Supr., No. 357, 1993, 1994 WL 175593, Moore, J. (Apr. 29, 1994) (ORDER), police officers saw the defendant acting suspiciously upon noticing their presence. The officers

■ The case now before us presents a different situation. By ordering Jones to stop and remove his hands from his coat, Patrolman Echevarria engaged in conduct that would communicate to a reasonable person that he or she was not free to ignore the police presence. The reasonableness of Patrolman Echevarria's suspicion must rest on the facts known to him at the time he ordered Jones to stop. He had no reasonable and articulable ground to suspect that Jones was committing, had committed or was about to commit a crime. In *Hodari D.*, the officers had not seized the defendant before the defendant's flight. Even assuming that flight (combined with other articulable factors and when not provoked by an unwarranted police seizure) may provide sufficient reasonable and articulable suspicion to justify a seizure, that did not occur here, and therefore this case is distinguishable from *Hodari D.*[29]

The State relies on *Hodari D.* for the proposition that seizure does not occur until the officer uses physical force or the defendant submits to the authority of the officer. *Hodari D.* is binding precedent for this Court insofar as it interprets the Fourth Amendment to the United States Constitution because the almost two hundred year old doctrine of judicial review established the United States Supreme Court as the final arbiter of the United States Constitution.[30]

■ But in this case, our holding rests not on the Fourth Amendment but on the Delaware detention statute, 11 *Del. C.* § 1902, and Article I, § 6 of the Delaware Constitution. The Delaware Constitution, like the constitutions of certain other states, may provide individuals with greater rights than those afforded by the United States Constitution. For example, we have held that the Delaware Constitution provides greater rights than the United States Constitution in the preservation of evidence used against a defendant,[31] the right of confrontation,[32] the right to counsel,[33] and the right to trial by jury.[34] *Hodari D.* is not consistent with our view of when a person is "seized" within the mean-

approached the defendant, but he attempted to flee after consenting to answer questions. The police officers had not manifested any basis for the defendant reasonably to believe he was not free to leave. On these facts, this Court followed the rule enunciated in *Hodari D.* and decided that the contraband discarded during the chase was admissible. Although it is not clear from the order in *Gholdson*, we assume this Court was applying the Fourth Amendment and thus following *Hodari D.* only to that extent because the defendant asserted only rights that were guaranteed to the United States Constitution. There is no reference in *Gholdson* either to the Delaware Constitution or the statutory law on which we base the decision in the case before us, those protections having been raised by Jones in this appeal.

29. A case presently before the United States Supreme Court concerns whether "sudden and unprovoked flight from a clearly identifiable police officer, who is patrolling a high crime area, is sufficiently suspicious to justify a temporary investigatory stop pursuant to *Terry v. Ohio*." *People v. Wardlow*, 183 Ill.2d 306, 233 Ill.Dec. 634, 701 N.E.2d 484 (1998), *cert. granted sub nom. Illinois v. Wardlow*, — U.S. ——, 119 S.Ct. 1573, 143 L.Ed.2d 669,

67 U.S.L. W. 3437 (May 3, 1999) (No. 98–1036) (argued Nov. 2, 1999). The Supreme Court's eventual ruling in *Wardlow* is unlikely to impact our analysis for two reasons. First, *Wardlow* involves an interpretation of the Fourth Amendment, while the present case rests on an interpretation of the Delaware Constitution and the Delaware detention statute. Second, the type of flight in *Wardlow*—running upon the sight of officers—may lead to a different inference about reasonable suspicion than merely turning and walking away from officers, as Jones did here. *See supra* note 3.

30. *See Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803).

31. *See Hammond v. State*, Del.Supr., 569 A.2d 81, 87 (1989).

32. *See Van Arsdall v. State*, Del.Supr., 524 A.2d 3, 6–7 (1987).

33. *See Bryan v. State*, Del.Supr., 571 A.2d 170, 176 (1990).

34. *See Claudio v. State*, Del.Supr., 585 A.2d 1278, 1298 (1991).

ing of Article I, § 6 of the Delaware Constitution in that *Hodari D.* would allow a police officer lacking reasonable suspicion to create that suspicion through an unjustified attempted detention. A number of states have likewise interpreted *Hodari D.* as inconsistent with the protections provided by their state constitutions.[35]

The issue in the present case is whether the search and seizure language in the Delaware Constitution means the same thing as the United States Supreme Court's construction of *similar* language in the United States Constitution. To answer that question requires this Court to apply a logical, deductive analytical process. Our comprehensive historical analysis of the right to trial by jury in *Claudio* demonstrates that the guarantees in the Delaware Constitution for trial by jury were originally intended to be greater than those in the United States Constitution and remain that way.

Several other states have developed useful criteria for determining whether a provision in the United States Constitution has a meaning identical to a similar provision on the same subject in a state's constitution. The following is a partial list of those non-exclusive criteria from other states as marshalled by Justice Handler of the New Jersey Supreme Court in his 1982 concurrence in *State v. Hunt:* [36]

(1) Textual Language—A state constitution's language may itself provide a basis for reaching a result different from that which could be obtained under federal law. Textual language can be relevant in either of two contexts. First, distinctive provisions of our State charter may recognize rights not identified in the federal constitution. . . .

Second, the phrasing of a particular provision in our charter may be so significantly different from the language used to address the same subject in the federal Constitution that we can feel free to interpret our provision on an independent basis . . . .

(2) Legislative History—Whether or not the textual language of a given provision is different from that found in the federal Constitution, legislative history may reveal an intention that will support reading the provision independently of federal law. . . .

(3) Preexisting State Law—Previously established bodies of state law may also suggest distinctive state constitutional rights. State law is often responsive to concerns long before they are addressed by constitutional claims. Such preexisting law can help to define the scope of the constitutional right later established.

(4) Structural Differences—Differences in structure between the federal and state constitutions might also provide a basis for rejecting the constraints of federal doctrine at the state level. The United States Constitution is a grant of enumerated powers to the federal government. Our State Constitution, on the other hand, serves only to limit the sovereign power which inheres directly in the people and indirectly in their elected representatives. Hence, the explicit affirmation of fundamental rights in our Constitution can be seen as a guarantee of those rights and not as a restriction upon them.

---

**35.** *See, e.g., State v. Young,* 135 Wash.2d 498, 957 P.2d 681, 687 (1998); *Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769, 776 (1996); *State v. Tucker,* 136 N.J. 158, 642 A.2d 401, 405 (1994); *State v. Tucker,* La.Supr., 626 So.2d 707, 712 (1993); *In re Welfare of E.D.J.,* Minn.Supr., 502 N.W.2d 779, 783 (1993); *State v. Quino,* 74 Haw. 161, 840 P.2d 358, 362 (1992), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993). *Compare, e.g., Harper v. State,* Miss.Supr., 635 So.2d 864, 866–67 (1994); *Perez v. State,* Fla. Supr., 620 So.2d 1256, 1258 (1993) (finding that the Florida constitution specifically prohibits a court from interpreting the Florida constitution as providing greater protection than the Fourth Amendment to the U.S. Constitution).

**36.** 91 N.J. 338, 450 A.2d 952, 962 (1982) (Handler, J., concurring).

(5) Matters of Particular State Interest or Local Concern—A state constitution may also be employed to address matters of peculiar state interest or local concern. When particular questions are local in character and do not appear to require a uniform national policy, they are ripe for decision under state law. Moreover, some matters are uniquely appropriate for independent state action. . . .

(6) State Traditions—A state's history and traditions may also provide a basis for the independent application of its constitution . . . .

(7) Public Attitudes—Distinctive attitudes of a state's citizenry may also furnish grounds to expand constitutional rights under state charters. While we have never cited this criterion in our decisions, courts in other jurisdictions have pointed to public attitudes as a relevant factor in their deliberations.[37]

"The enumerated criteria, which are synthesized from a burgeoning body of authority, are essentially illustrative, rather than exhaustive. They share a common thread—that distinctive and identifiable attributes of a state government, its laws and its people justify recourse to the state constitution as an independent source for recognizing and protecting individual rights."[38]

As noted earlier,[39] the search and seizure provision in the Delaware Constitution preceded the adoption of the Fourth Amendment and was originally like a similar provision in the Pennsylvania Constitution. When the Delaware Constitution was amended in 1792 after the Fourth Amendment had already been adopted, Delaware continued to follow the search and seizure language from the Pennsylvania Constitution rather than the language in the Fourth Amendment.

Delaware adopted the first search and seizure protections for its citizens in September of 1776 as part of the Declaration of Rights and Fundamental Rules of the Delaware State, which read as follows:

Sect. 17. That all warrants without oath to search suspected places, or to seize any person or his property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend all persons suspected, without naming or describing the place or any person in special, are illegal and ought not to be granted.

Delaware's Declaration of Rights was based upon a similar provision in the Pennsylvania Declaration of Rights. The chairman of the committee that drafted Delaware's Declaration of Rights was George Read. On September 17, 1776, Read wrote that "the Declaration of Rights . . . has been completed somedays past but there being nothing particularly in it—I did not think it an object of much curiosity, it is made out of the Pensilvania [sic] & Maryland Draughts."[40]

Delaware ratified the Bill of Rights to the United States Constitution on January 28, 1790.[41] Pennsylvania adopted a new state constitution in 1791. Delaware adopted a new constitution in 1792.

The Delaware Constitution of 1792 "resembled in some ways the federal constitution because of the presence of John Dick-

---

37. *Id.* at 965–66 (citations and footnotes omitted).

38. *Id.* at 967. Related case law from other states also furnish criteria for the analysis. *See, e.g., Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 895 (1991); *State v. Linares,* Conn.Supr., 232 Conn. 345, 655 A.2d 737, 753–56 (1995); *State v. Gomez,* 122 N.M. 777, 932 P.2d 1, 8 n. 3 (1997); *State v. Gunwall,* 106 Wash.2d 54, 720 P.2d 808, 812–13 (1986).

39. *See supra* note 12.

40. 1 Bernard Schwartz, *The Bill of Rights: A Documentary History* 276 (1971) (ellipsis in original).

41. 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 1195 (1971).

inson and Richard Bassett, who had served as members of the Philadelphia Convention, and because the members were familiar with the federal constitution." [42] Article I in the 1792 Delaware Constitution "contained a [B]ill of [R]ights of nineteen provisions, which was mostly a rewriting of the Declaration of Rights of the Delaware [C]onstitution of 1776. Some portions showed that the members were familiar with the [1791] [C]onstitution of Pennsylvania." [43] The search and seizure provision in the 1792 Delaware Constitution exemplifies that familiarity because it tracks a similar provision in the 1791 Pennsylvania Constitution.

In a 1991 case, *Commonwealth v. Edmunds,* the Pennsylvania Supreme Court undertook a comprehensive historical review of the search and seizure provision in the Pennsylvania Constitution.[44] The *Edmunds* Court concluded that the history of that provision reflected *different* and *broader* protections than those guaranteed by the Fourth Amendment.[45] In a 1996 case, *Commonwealth v. Matos,* the Pennsylvania Supreme Court concluded that the construction of the United States Constitution in *Hodari D.* by the United States Supreme Court was "inconsistent with the constitutional protections afforded under Article I, Section 8 of the Pennsylvania Constitution." [46] That conclusion was based on the fact that "the survival of the language now employed in Article I, Section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth." [47]

We reach the same conclusion with regard to the search and seizure provision in the Delaware Constitution based upon its historical convergence for more than two hundred years with the same provision in the Pennsylvania Constitution. The history of search and seizure in Delaware reflects the same commitment to protecting the privacy of its citizens. As we have previously noted, that commitment is illustrated by Delaware's nighttime search warrant statute which, even in its original version adopted by the Delaware General Assembly almost 150 years ago, required a stricter standard than probable cause before a court could issue a nighttime search warrant.[48]

 The United States Constitution establishes a system of dual sovereignty: a federal government and state governments. That system has horizontal and vertical aspects.[49] Vertical federalism binds the states to the will of the federal sovereign government with regard to the enumerated powers that have been surren-

---

**42.** Claudia L. Bushman et al., *Proceedings of the House of Assembly of the Delaware State 1781–1792 and of the Constitutional Convention of 1792* 36–37 (1988); *see also Claudio v. State,* Del.Supr., 585 A.2d 1278, 1291–98 (1991).

**43.** Bushman et al., *supra* note 42, at 37.

**44.** 526 Pa. 374, 586 A.2d 887 (1991).

**45.** *See id.* at 895–99.

**46.** 543 Pa. 449, 672 A.2d 769, 776 (1996).

**47.** *Id.* at 773 (quoting *Edmunds,* 586 A.2d at 897).

**48.** *Mason v. State,* Del.Supr., 534 A.2d 242, 248 & n. 15 (1987). The present version of the nighttime search warrant statute reads:

A search warrant shall not authorize the person executing it to search any dwelling house in the nighttime unless the judge, justice of the peace or magistrate is satisfied that it is necessary in order to prevent the escape or removal of the person or thing to be searched for, and then the authority shall be expressly given in the warrant. For purposes of this section the term "nighttime" shall mean the period of time between 10:00 p.m. and 6:00 a.m.
11 Del.C. § 2308.

**49.** The terms "vertical federalism" and "horizontal federalism" are attributable to G. Alan Tarr and Mary Cornelia Aldis Porter, *State Supreme Courts in State and Nation* 2 (1988).

dered. Horizontal federalism permits the states to look to the jurisprudence of sister states in defining the sovereign powers that have been reserved for state governments.

Although the facts are different, the 1992 Connecticut Supreme Court case of *State v. Oquendo* illustrates the application of state constitutional protections that exceed those provided by the Fourth Amendment as interpreted by the *Hodari D.* Court.[50] *Oquendo* has particular relevance here because one of the applicable Connecticut constitutional provisions relating to searches and seizures is identical to Article I, § 6 of the Delaware Constitution.[51] Moreover, these provisions in the Constitutions of Delaware and Connecticut, as well as Pennsylvania, New Jersey and other states tracing their roots to the thirteen original colonies, share venerable origins that precede the adoption of the Fourth Amendment to the United States Constitution.[52] In *Oquendo*, the court invalidated a search because it found that the police lacked a reasonable and articulable suspicion on the following facts: When asked by the police to approach the police car, the defendant handed his duffel bag (later found to contain cocaine) to another individual.[53] When instructed to bring the duffel bag with him, the defendant grabbed the bag and ran away. Upon giving chase, the officer saw the defendant throw the duffel bag in the woods. The duffel bag was found to contain cocaine. Other incriminating evidence related to a homicide (for which the defendant was later charged) was later found in the same wooded area. The Connecticut Supreme Court said:

> The state urges this court to read the definition of a "seizure," as interpreted by the United States Supreme Court in *California v. Hodari D., supra,* into ... our state constitution. The state argues that since [the officer] never applied physical force to the defendant's person and the defendant did not submit to [the officer's] assertion of authority when he ordered the defendant to stop, the defendant's state constitutional rights were not implicated.[54]
>
> . . . .
>
> ... [W]e decline to adopt the restricted definition of a seizure employed by the United States Supreme Court in *Hodari D.* and adhere to our precedents in determining what constitutes a seizure under the state constitution.[55]
>
> . . . .
>
> ... [W]e are persuaded that a reasonable person in the defendant's position would not have believed that he was free to ignore [the officer's] instructions and walk away. Accordingly, we conclude that a seizure took place within the meaning of ... the Connecticut constitution.[56]
>
> . . . .
>
> Having determined that a seizure of the defendant took place, we must next determine whether the trial court properly concluded that the seizure was based on a reasonable and articulable basis of suspicion. We conclude that the

---

**50.** *State v. Oquendo*, 223 Conn. 635, 613 A.2d 1300, 1310 (1992).

**51.** *See id.* at 1304 n. 3, 1309–10. The other state constitutional provision relied on by the *Oquendo* Court (article first, § 9) provides that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law." *Id.* at 1304 n. 3.

**52.** *See Declaration of Rights and Fundamental Rules of the Delaware State* § 17 (Del.1776);

*see also* Ellen A. Peters, *Common Law Antecedents of Constitutional Law in Connecticut,* 53 Alb. L.Rev. 259 (1989).

**53.** *See Oquendo,* 613 A.2d at 1305.

**54.** *Id.* at 1308.

**55.** *Id.* at 1310 (citations and a footnote omitted).

**56.** *Id.* at 1310–11.

trial court's determination was clearly erroneous.[57]

. . . .

We recognize that police on patrol perform a variety of functions. Thus, a police officer, in carrying out his duties, may stop and speak to an individual on the street without necessarily implicating the individual's constitutional rights. We acknowledge, furthermore, that the police must enjoy a certain degree of latitude in making investigative stops. Nevertheless, the requirement of a reasonable and articulable factual basis for an investigative stop must be met. We have consistently stated that a police officer's decision to detain an individual for investigatory purposes "must be predicated 'on more than a mere hunch.' "

We are persuaded that the informational basis advanced by [the officer] to justify his stop of the defendant, which [the officer] himself characterized as a "hunch," was insufficient to support a reasonable and articulable suspicion. *In a close case like the present one, the balance ought to be struck on the side of the freedom of the citizen from governmental intrusion. To conclude otherwise would be to elevate society's interest in apprehending offenders above the right of citizens to be free from unreasonable stops.* The record in the present case does not disclose circumstances which, viewed in their totality, yielded sufficient specific and articulable facts to make constitutionally reasonable [the officer's] detention of the defendant. Accordingly, we conclude that the defendant was illegally seized, in violation of article first, §§ 7 and 9 of the Connecticut constitution.[58]

In our view, the reasoning of the *Oquendo* Court and that of the other state supreme courts noted above [59] is persuasive. Accordingly, we decline to follow *Hodari D.* to the extent set forth in this opinion.

Although our opinion in *Quarles* cites *Hodari D.,* the *Quarles* case is consistent with our decision today because in *Quarles* the Court used the Fourth Amendment standard articulated by the United States Supreme Court in *Chesternut* to find that the police had not seized the defendant before the defendant's flight.[60] The *Quarles* decision was based solely on defendant's contention that his Fourth Amendment rights had been violated. In *Quarles,* the defendant did not assert a violation of either the statute or the Delaware Constitution, both of which were relied upon by Jones in the Superior Court and on this appeal.

In *Quarles,* no question existed that the *Terry*-stop was a seizure. There, we said that a Fourth Amendment seizure clearly occurred where defendant's "stopping was an act of submission to a show of authority by the police" because under "all the circumstances, 'a reasonable person would have believed that he was not free to leave.' " [61] This Court in *Quarles* focussed instead on "whether the police conduct [could] survive constitutional scrutiny" by applying the standard from *Terry*, which we summarized as holding that "[u]nder the Fourth Amendment, a police seizure can be justified only when, based upon specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the belief that a crime is being or has been commit-

---

57. *Id.* at 1311.

58. *Id.* at 1312 (emphasis added) (citations and a footnote omitted).

59. *See supra* note 35.

60. *See Quarles,* 696 A.2d at 1337 ("The question presented to this Court is whether the police approached Quarles in such a manner

that he felt compelled to yield to the officers' control and if so, whether the police had an articulable basis to suspect he was committing a crime.").

61. *Quarles,* 696 A.2d at 1337 (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

ted." [62] The Court in *Quarles* based its decision on a combination of both objective facts and the subjective impressions of the police officer who was trained and experienced in spotting and interdicting drug trafficking. [63]

In our view, the question presented by Jones of when a seizure has occurred under Article I, § 6 of the Delaware Constitution requires focusing upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence. Under that analysis, Jones was seized within the meaning of Section 1902 and Article I, § 6 when Patrolman Echevarria first ordered him to stop and remove his hands from his pockets. If that seizure was not based upon reasonable and articulable suspicion, anything recovered as a result of that seizure is inadmissible at trial. [64] We conclude that Jones' actions in walking away from Patrolman Echevarria and his refusal to obey or submit to the officer's commands to stop and remove his hands from his pockets did not furnish grounds for reasonable and articulable suspicion to effect the seizure.

### The Police Officers Here Did Not Have Any Reasonable and Articulable Basis for Suspicion

 The Superior Court cited four factors as its bases for finding that Officer Echevarria possessed reasonable suspicion to stop Jones pursuant to 11 *Del. C.* § 1902: (1) 85 Karlyn Drive was in close proximity to 98 Karlyn Drive, the subject of the 911 complaint; (2) the events took place at night; (3) Garfield Park is a high crime and high drug area; and (4) Jones fit the general physical description provided in the 911 complaint.

Before analyzing those bases of reasonable suspicion, it is appropriate to review how courts have treated the probative value of anonymous tips. [65] The importance of that inquiry stems from the fact that the first and fourth factors applied by the Superior Court depend almost entirely on the information provided by the anonymous 911 complaint. The first basis for reasonable suspicion found by the Superior Court was that Patrolman Echevarria spotted Jones in close proximity to 98 Karlyn Drive, the area mentioned in the 911 complaint. The fourth basis was that Jones matched the general physical description provided by the 911 complainant. In applying these factors, the Superior Court concluded that the 911 complaint, which spoke merely of a "suspicious black male wearing a blue coat" in the vicinity of 98 Karlyn Drive, furnished reasonable and articulable suspicion. In our view, the Superior Court overvalued the 911 complaint as furnishing a credible basis for that conclusion.

In *Alabama v. White,* [66] the United States Supreme Court held that a trial court must look at the totality of the circumstances when deciding whether an anonymous telephone tip of criminal activi-

---

**62.** *Id.* (citing *Terry v. Ohio,* 392 U.S. 1, 17–18, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

**63.** *See id.* at 1337–39.

**64.** *See generally Schaffer v. Anderson,* D.Del., 224 F.Supp. 184 (1963). In *Schaffer,* the District Court invalidated a Delaware State Court conviction by granting petitions for writ of *habeas corpus* upon a finding that police seized evidence from one of the defendants twenty minutes after the expiration of the two hour detention period permitted by 11 *Del. C.* § 1902. Since the police did not possess facts constituting probable cause independent of the seized evidence and the defendant did not consent to the seizure, the court found that the admission of the evidence in the state prosecution was improper. *See id.* at 187.

**65.** The Supreme Court has accepted certiorari in a case involving whether police may stop and frisk a pedestrian for a gun based on an anonymous tip that accurately described the person's location and clothing. *See J.L. v. State,* Fla.Supr., 727 So.2d 204 (1998), *cert. granted sub nom. Florida v. J.L.,* —— U.S. ——, 120 S.Ct. 395, 145 L.Ed.2d 308 (1999).

**66.** 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

ty provides reasonable suspicion for the police to effect a stop. The *White* decision, while ultimately finding that reasonable suspicion did exist, relied on the specific facts of the case, including: (1) the specificity of the anonymous tip; (2) independent police corroboration of the facts underlying the tip; and (3) the ability of the tipster to predict future behavior by the suspect. Despite this evidence suggesting reliability of the tip, the majority of the *White* court still considered it "a close case." [67]

In the Arizona case of *State v. Altieri*,[68] the police received an anonymous tip describing a driver, his first name, his vehicle and the vehicle's location and direction. The tipster also stated that the vehicle contained a specific amount of drugs and cash. Upon stopping the defendant's vehicle, the police found drugs and cash. Importantly, the police stopped the defendant only because his vehicle matched the description given by the tipster, not because of any observed illegal activity. The Arizona Supreme Court reversed the defendant's convictions, finding the tip unreliable and unsupported by independent police corroboration of present criminal activity or predicted future criminal activity. The *Altieri* Court found that the information actually corroborated by the police was of a type that could be given by any person who saw the defendant driving by. It further noted that the case before it was distinguishable from a case in which the informant was known, reliable and previously had predicted correctly future activity by the defendant.[69]

The 1990 North Dakota case of *City of Minot v. Nelson*[70] presents facts even closer to this case. In *Nelson*, police received an anonymous complaint of a "suspicious" car in front of a trailer. A second call (possibly from the same caller) gave the license number of the car. When the officer arrived, the car was not in front of the trailer, but being driven near it. The officer stopped the car and eventually arrested the driver for driving under the influence of alcohol. The North Dakota Supreme Court reversed the driver's conviction, finding the record devoid of any indicia of reliability of the informant or the information provided. The Court stated that "[i]t would have been relatively easy for the dispatcher to solicit some minimal articulable facts from the anonymous informant to support the bare assertion that the vehicle was suspicious." [71] Since the officer observed no corroborative criminal behavior, the court found that the stop was not supported by reasonable suspicion.

Here, as in *Altieri*, the facts contained in the 911 complaint were readily observable to anybody who saw the defendant. As in *Nelson*, the caller here stated only that the person was "suspicious" without providing any articulable support for that subjective conclusion. When Patrolman Echevarria arrived, his own observations added nothing to the 911 caller's statement and did not corroborate or particularize the conclusory term "suspicious." The State has not presented any extrinsic evidence of reliability to support the anonymous tip. A person's (particularly an anonymous caller's) subjective belief that another person is "suspicious," without more, fails to raise a reasonable and articulable suspicion of criminal activity.[72]

67. *See id.* at 330–32, 110 S.Ct. 2412.

68. 191 Ariz. 1, 951 P.2d 866 (1997) (en banc).

69. *Id.* at 867–69.

70. N.D.Supr., 462 N.W.2d 460 (1990).

71. *Id.* at 462.

72. The fact that the 911 complaint referred to a "suspicious black male" rather than a person engaged in suspicious activity is troubling. We cannot imagine a circumstance where a police officer could objectively corroborate a 911 caller's claim that a person, as distinct from a person's activity, is suspicious. We do not find on this record, however, that the police used the color of the defendant's skin as an indicium of suspiciousness so as to lead to an inference of unwarranted stereotyping. The record in this particular case is consistent with the inference that the police

Our finding that the 911 complaint alone did not suffice to establish reasonable and articulable suspicion requires us to search the record for any other evidence the police might have possessed to support a finding of reasonable and articulable suspicion sufficient to detain Jones. The record fails to reveal any such evidence. As the United States Supreme Court noted in *White*, "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable."[73] Here, the question is whether the evidence remaining once the tip is removed suffices to establish that Patrolman Echevarria held a reasonable and articulable suspicion of criminal activity prior to seizing Jones. Without the benefit of the 911 complaint, the first and fourth bases enumerated by the Superior Court cannot aid in establishing reasonable suspicion. The fact that Patrolman Echevarria found Jones wearing a blue coat near 98 Karlyn Drive, by itself, indicates nothing to suggest any criminal activity.

■ The second and third bases enumerated by the Superior Court (that the events took place at night in a high crime/high drug area) do not depend on the 911

complaint. In *Brown v. Texas*, the United States Supreme Court held that a defendant's presence in a high crime area, by itself, will not establish reasonable suspicion.[74] In our opinion, the fact that a defendant's presence in such a neighborhood took place at ten o'clock at night does not suggest a result different from that reached in *Brown*. Courts generally use factors such as nighttime and the negative reputation of a neighborhood as additional support to bolster a finding of reasonable suspicion, not as the sole bases on that finding.[75] Reasonable and articulable suspicion cannot be based on a defendant's presence in a particular neighborhood at a particular time of day with no independent evidence that the defendant has committed, is committing or is about to commit a crime. It is reasonable to assume that the framers of our constitutional protections against unreasonable searches and seizures were aware that law-abiding citizens who found themselves inadvertently in similar circumstances during colonial times were challenged by British soldiers.[76]

■ The facts presented by the State are not "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant

relied in good faith, but erroneously, on insufficient facts to provide a basis for reasonable and articulable suspicion.

73. 496 U.S. at 330, 110 S.Ct. 2412.

74. 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

75. *See, e.g.,* the following cases in which a finding of reasonable suspicion was upheld: *United States v. Rideau,* 5th Cir., 969 F.2d 1572, 1574–75 (1992) (nighttime, high crime neighborhood, plus police observation of defendant acting inebriated); *United States v. Gilliard,* 1st Cir., 847 F.2d 21, 25 (1988) (nighttime, high crime neighborhood plus reliable tip of drug activity and police observation of what appeared to be a drug transaction); *State v. Abdullah,* R.I.Supr., 730 A.2d 1074, 1077–78 (1999) (nighttime, high crime neighborhood plus defendant's companion dropped two bags upon approach of police and defendant "quickly walked away"); *People v. Champion,* 452 Mich. 92, 549 N.W.2d

849, 853, 859 n. 13 (1996) (eight factors including high crime neighborhood plus unprovoked flight by others while defendant, known to the officers as someone with a criminal record, was walking away from his parked car with his hands in his pockets); *State v. Andrews,* 57 Ohio St.3d 86, 565 N.E.2d 1271, 1273–74 (1991) (five factors including nighttime, high crime neighborhood plus unprovoked flight); *State v. Williams,* 157 Conn. 114, 249 A.2d 245, 247 (1968) (nighttime, high crime neighborhood plus tip of drug activity from known and reliable informant). We express no view on the sufficiency of the factors found in these cases because the case before us is much weaker.

76. *See* Claudia L. Bushman et al., *Proceedings of the Assembly of the Lower Counties on Delaware 1770–1776, of the Constitutional Convention of 1776, and of the House of Assembly of the Delaware State 1776–1781* 198–215 (1986).

th[e] intrusion." [77] Therefore, under our interpretation of 11 *Del. C.* § 1902 and Article I, § 6 of the Delaware Constitution, we find that Patrolman Echevarria did not possess a reasonable and articulable suspicion to stop Jones.[78]

### Resisting Arrest

The State argues that Jones' conduct in resisting arrest—even though the arrest was illegal—justifies the search and the admission of the evidence seized. Resisting arrest in Delaware is a class A misdemeanor and occurs "when the person intentionally prevents or attempts to prevent a peace officer from effecting an arrest or detention." [79] The statute does not make a distinction between legal and illegal arrests. But the law of Delaware is that the term "arrest" as used in the statute refers only to the physical act of arrest and not to the underlying legality of the arrest. Thus, a defendant may be found guilty of resisting an illegal arrest.[80]

In this case, Jones was found guilty of resisting arrest, notwithstanding the fact that Patrolman Echevarria lacked reasonable and articulable suspicion to stop Jones pursuant to section 1902 and Article I, § 6 of the Delaware Constitution. The State

argues that the evidence was properly admitted because Patrolman Echevarria had a right to arrest and search Jones once Jones broke the law by resisting arrest. In effect, the State contends that the crime of resisting arrest caused the application of either the independent source or inevitable discovery exceptions to the exclusionary rule.

The State's premise for this argument is correct. A peace officer has the right to seize and search any person whom the officer observes breaking the law. The search is justified as incident to a lawful arrest.[81] But the crime of resisting an illegal arrest does not necessarily carry with it the right to justify any search incident to an actual arrest for the crime of resisting an illegal arrest. Otherwise there would be significant potential for official abuse. Therefore, we must consider the situation in a manner that does not nullify important constitutional rights.

The exclusionary rule acts as a remedy for a violation of a defendant's right to be free of illegal searches and seizures. It provides for the exclusion from trial of any evidence recovered or derived from an illegal search and seizure.[82] But the United States Supreme

---

**77.** *Coleman v. State,* Del.Supr., 562 A.2d 1171, 1174 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

**78.** The search in this case cannot be validated on the officers' concern for their safety. The State treats the "officer safety" exception as something separate and distinct from the need for "articulable suspicion." But "officer safety," at least on this record, does not obviate the court's obligation to assess independently the legality of the officer's action. We agree with the Seventh Circuit that "while officer safety is 'both legitimate and weighty,' it cannot in all circumstances justify a search or seizure. Otherwise nearly any invasion of a person's privacy could be justified by arguing that the police needed to protect themselves from harm." *U.S. v. Johnson,* 7th Cir., 170 F.3d 708, 718 (1999) (citations omitted) (quoting *Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998)). Here, having one's hands in one's pockets

does not, without more, satisfy the officer safety exception. The officer needs an articulable suspicion, appropriate to the circumstances. *See Knowles,* 525 U.S. 113, 119 S.Ct. at 488.

**79.** 11 *Del. C.* § 1257.

**80.** *See Ellison v. State,* Del.Super., 410 A.2d 519, 523 (1979), *aff'd,* Del.Supr., 437 A.2d 1127 (1981) (per curiam), *cert. denied,* 455 U.S. 1026, 102 S.Ct. 1730, 72 L.Ed.2d 147 (1982).

**81.** *See United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) ("It is well settled that a.search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment."); *Traylor v. State,* Del.Supr., 458 A.2d 1170 (1983) (citing *Robinson* ).

**82.** *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Wong Sun v.*

Court has found exceptions to this rule in situations where the police had an independent source for the evidence untainted by their misconduct[83] and in situations where the police inevitably would have discovered the evidence.[84] We have held that official misconduct should not fatally taint evidence that would have been discovered absent that official misconduct.[85] The case before us is different, however.

 The United States Supreme Court has stated that the "prime purpose" of the exclusionary rule "is to deter future unlawful police conduct."[86] Further, it is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."[87] We join the many other state supreme courts that have concluded there are state constitutional dimensions to the enforcement of the exclusionary rule, and specifically find here that those dimensions are correlative to fundamental Delaware state constitutional rights and to preserving the integrity of the judicial system in Delaware.[88] We must look beyond the facts of this individual case and weigh the potential for abuse if we were to establish a precedent that would allow the admission of evidence seized as a result of a defendant's resisting an illegal arrest.

The purpose behind the rule that resisting even an illegal arrest constitutes a crime is to foster the effective administration of justice, to deter resistance to arrest and to provide for the safety both of peace officers and the citizens of Delaware.[89] In our view, this purpose cannot be used to allow an officer, lacking reasonable suspicion to effect a stop or search that leads to an illegal arrest, to contend that evidence seized incident to that illegal arrest is admissible. That would be a result reached by bootstrap analysis. Accordingly, we hold that in these circumstances the State may not use as evidence the fruits of a search incident to an illegal arrest.

### Conclusion

The law concerning unreasonable searches and seizures reflects differing standards between federal and state constitutions and a labyrinth of factual situations.[90] It is important, however, that

*United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

83. *See Segura v. United States*, 468 U.S. 796, 805, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (independent source).

84. *See Nix v. Williams*, 467 U.S. 431, 448, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (inevitable discovery); *United States v. Allen*, 4th Cir., 159 F.3d 832, 841 (1998) ("The inevitable discovery doctrine applies to alleviate 'formalistic' and 'pointless' applications of the exclusionary rule, but it does not and cannot eliminate Fourth Amendment protections.") (citation omitted).

85. *See Cook v. State*, Del.Supr., 374 A.2d 264, 267–68 (1977) (inevitable discovery).

86. *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *see also State v. Deputy*, Del.Supr., 433 A.2d 1040, 1044 (1981); *State v. Siple*, Del.Super., IN94–12–1641 to –1672, 1996 WL 528405, Cooch, J. (July 19, 1996) (Mem.Op.).

87. *Calandra*, 414 U.S. at 348, 94 S.Ct. 613.

88. In a 1990 opinion, the Utah Supreme Court identified 18 states that had adopted an independent state constitutional rule barring the use of illegally seized evidence. *See State v. Larocco*, Utah Supr., 794 P.2d 460, 473 (1990). Those states were: Alaska, Colorado, Connecticut, Hawaii, Kentucky, Louisiana, Massachusetts, Michigan, Montana, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Oregon, Pennsylvania, Washington, and Wisconsin. The Utah court also noted that Texas and some other states have a statutory exclusionary rule that predates *Mapp*. *See id.* at 472.

89. *See Ellison*, 410 A.2d at 523–24 (citing in part to the commentary on 11 *Del. C.* § 1257).

90. *See United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise.").

Delaware courts be clear. If an officer attempts to seize someone before possessing reasonable and articulable suspicion, that person's actions stemming from the attempted seizure may not be used to manufacture the suspicion the police lacked initially.

The courts cannot naively turn a blind eye to the realities of society's war against drugs and the experience of police officers in combating drug traffic in our cities, towns and rural areas.[91] This case, however, turns on the constitutional rights provided to all citizens by the framers of our Delaware Constitution to be free of unreasonable searches and seizures. The judicial branch of government is obliged to enforce these rights for the protection of all citizens.[92]

The Framers of the United States Constitution adopted a " 'constitutionally mandated balance of power' between the States and the Federal Government ... to ensure the protection of 'our fundamental liberties.' "[93] The preservation of diversity in the legal and governmental systems of each state was expressly contemplated when the United States Constitution was framed and adopted.[94]

We hold that the Superior Court erred as a matter of Delaware statutory and Delaware constitutional law in denying Jones' motion to suppress evidence seized on the night of January 11, 1997. Accordingly, the judgment of the Superior Court is reversed.

HARTNETT, Justice, concurring.

I concur in the result, but because the result is controlled by 11 *Del. C.* § 1902, in

my opinion Article 1 § 6 of the Delaware Constitution and the U.S. Supreme Court's ruling in *California v. Hodari D.*[95] are not implicated. I, therefore, desire to clarify that some of the discussion of constitutional issues is unnecessary.[96] And it is also *obiter dictum.*

---

91. *See Quarles,* 696 A.2d at 1339.

92. *See id.* at 1345–46 (Veasey, C.J., dissenting); *Oquendo,* 613 A.2d at 1312 (quoted *supra* in text accompanying note 58).

93. *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (quoting *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 572, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (Powell, J., dissenting)).

94. *See* Randy J. Holland, *State Constitutions: Purpose and Function,* 69 Temp. L.Rev. 989, 998–99 (1996).

95. 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

96. *See Downs v. Jacobs,* Del.Supr., 272 A.2d 706, 708 (1970).