IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMES McDOUGAL, | § | |
| | § | No. 170, 2023 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No.   2204003966 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |


Submitted: January 17, 2024
Decided:    March 21, 2024


Before **SEITZ**, Chief Justice; **VALIHURA, TRAYNOR**, **LeGROW**, and **GRIFFITHS**, Justices constituting the Court *en banc*.

Upon appeal from the Superior Court.  **REVERSED and VACATED.**

NICOLE M. WALKER, Esquire, OFFICE OF DEFENSE SERVICES, Wilmington, Delaware, *for Appellant James McDougal*.

ANDREW R. FLETCHER, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice, for the Majority:

James McDougal was convicted of possession of a firearm by a person prohibited, possession of ammunition by a person prohibited, and carrying a concealed deadly weapon. He was sentenced to 15 years in prison suspended after five years for 18 months of probation under intensive supervision. McDougal's convictions and sentence followed the Superior Court's denial of his pretrial motion to suppress the evidence taken from him during a street encounter with members of the Wilmington Police Department.[1] Although the State's description of the encounter and McDougal's ensuing detention, including the suspicions justifying them, has shifted over time, the principal justification for McDougal's seizure, according to the State, was that "[t]he police officers had reasonable articulable suspicion that McDougal was loitering."[2] This suspicion, the State contends, justified McDougal's initial detention. And, so the State argues, when McDougal chose not to provide identification or agree to a search of his person upon the officers' request, further investigation and eventually a pat-down search was justified. That search resulted in the discovery of a firearm concealed in McDougal's blue jeans.

---

[1] *See State v. McDougal*, 2023 WL 2423233 (Del. Super. Ct. Mar. 7, 2023) (hereinafter "*McDougal*").

[2] Answering Br. at 2.

As we explain below, the State's attempt to justify the officers' seizure and eventual search of McDougal on the basis of a suspected loitering investigation is grounded in a flawed understanding of the loitering statute, the supposed violation of which by McDougal aroused the officers' suspicion. The State has yet to identify the police officers' pre-detention observations that would warrant an investigative detention of McDougal for the crime of loitering. Simply put, the officers' suspicion of loitering was not reasonable and did not justify even a limited investigative seizure.

The officers, of course, were permitted to approach McDougal, engage him in conversation, and ask him his name. A consensual encounter like that does not require any level of suspicion. But it is well-settled, too, that when a police officer engages in such an interaction with a citizen, the citizen is not required to answer the officer's questions, and his refusal to answer cannot form the basis for reasonable suspicion of criminal activity.

Applying these principles to the facts surrounding McDougal's encounter with the police in this case, we have concluded that the officers' detention of McDougal and the consequent nonconsensual search of his person was unlawful. Accordingly, we hold that the Superior Court erred when it denied McDougal's motion to suppress and we reverse the court's judgment of conviction.

I

A

Unless otherwise indicated, we have drawn the facts surrounding McDougal's arrest from the transcript of the hearing on McDougal's motion to suppress. Two witnesses—both officers of the City of Wilmington Police Department, Officer Leonard Moses and Officer Shauntae Hunt—testified during that hearing. The Superior Court also reviewed, as we have, two body-worn camera videos that depicted a portion of the interaction between McDougal and the police.

The encounter occurred during the early afternoon hours of April 8, 2022.[3] During the month of March, an informant had reported to Wilmington police that "individuals in and around the area of 24[th] and Carter [Streets] were involved in street-level drug dealing."[4] The informant—who, according to Officer Moses, had not been shown to be reliable in the past—identified four suspected drug dealers by name: Rashad Acklin, Jamir Coleman, Demy Lee, and Dashawn Smith.

The tipster mentioned that, because of increased police presence in that area, the drug dealers, who according to the informant carried firearms, also used "ground stashes" to conceal their firearms. On some indeterminate date after the police

---

[3] The indictment alleges that the charged offenses occurred on April 8, 2022, but the suppression-hearing testimony suggests that McDougal's arrest was on April 13, 2022. Neither party addressed this discrepancy in their briefs or at oral argument, and both appear to concede that April 8 is the correct date. *See* App. to Opening Br. at A5, A8.

[4] *Id.* at A34.

received the tip but before they arrested McDougal, the police found a "discarded firearm behind a trash can"[5] in the area of 24th and Carter.

It is unclear how much time elapsed between the informant's tip and McDougal's arrest. Officer Moses first said that the tip was received "in the last weeks of March."[6] He later clarified that the tip was received during the "last two weeks of March."[7] Officer Moses was unsure of how much time passed between the discovery of the stashed firearm and the tip, but ventured his opinion that the tip was received "within a month"[8] of the discovery.

Armed with this weeks-old tip, several Wilmington police officers (we count six in the body-cam video) "were proactive patrolling"[9] in the area of 24th and Carter Streets. There, they saw three men standing on the sidewalk. Two of the men, Rashad Acklin and Jamir Coleman, were among the suspected drug dealers identified by the informant; the third was McDougal, with whom none of the officers was familiar.

Officer Moses alighted from his police vehicle and approached McDougal. According to Officer Moses, McDougal was wearing "baggy clothing with . . . multiple layers,"[10] an indication to Officer Moses that McDougal could be

---

[5] *Id.* at A35.
[6] *Id.*
[7] *Id*. at A38.
[8] *Id*. at A35.
[9] *Id.*
[10] *Id.*

5

concealing a weapon. By contrast, the body-cam video shows that McDougal was dressed in blue jeans and a red t-shirt covered by an unremarkable red sweatshirt.[11]

Although there was no outward sign that McDougal was armed, Officer Moses had concerns, which he then expressed to McDougal:

> I believe I asked him, I gave him what my concerns were, explained to him that I thought, I mean, that he had that bagg[y] clothing, asked him if he had any firearms on him, he said no. I asked him if I could pat him down, and he said no.

> At that point I asked him what his name was so I could get his name and then we'd identify him so we can give him his warning and then send him on his way, and the individual refused to give us his name.[12]

When McDougal refused to give his name, Officer Moses directed him to sit down on a nearby stoop. Meanwhile, other officers addressed Acklin and Coleman, both of whom identified themselves and consented to pat-down searches. Acklin and Coleman were then permitted to leave the area.

When asked at the suppression hearing to identify the criminal activity of which Officer Moses suspected McDougal when he directed McDougal to sit, the

---

[11] Officer Moses also mentioned that McDougal's "multiple layers" of clothing made it seem as though McDougal "had, like, multiple pairs of pants, or something like that under his clothing." *Id.* Unfortunately, the officers' body worn cameras were not activated until their initial approach to McDougal, Acklin, and Coleman had concluded. By the time the cameras were activated, McDougal was sitting down on a nearby stoop in compliance with Officer Moses's order. McDougal's trousers did not appear to be multi-layered until one of the officers lifted up McDougal's sweatshirt. This happened after McDougal had been, by all accounts, seized. We note here that the Superior Court referred twice to Officer Moses's observation that McDougal's clothing was "baggy" and "layered." *McDougal*, at *1, *3. We understand these references as reflecting Officer Moses's characterization and not a factual finding by the court that McDougal's clothing as depicted in the video meets that description.

[12] *Id.* at A36.

officer did not mention a suspicion of drug dealing or concealing a deadly weapon. Instead, he responded that he suspected McDougal of loitering. When pressed to describe what he meant by "loitering," Officer Moses said that "[s]tanding idle at the intersection of 24[th] and Carter" was the conduct underlying his suspicion of loitering.[13] Officer Hunt, who was on the scene, having traveled there in the same vehicle with Officer Moses, provided a similar understanding of the loitering statute:

> Q. Since you cited the loitering statute in your report, can you recall or are you aware of a place in the loitering statute where just standing on the sidewalk alone without first being ordered to move on can constitute the crime of loitering?
>
> A. Right. So if you are standing idle on the sidewalk, you are loitering.
>
> Q. Standing idle on the sidewalk?
>
> A. Yes.[14]

Unlike Officer Moses, however, Officer Hunt added that the three men were "blocking the flow of traffic on the sidewalk."[15] But neither officer testified that there was any pedestrian traffic on the sidewalk to block. Nor did either officer testify that anyone asked McDougal, Acklin, or Coleman to make way for pedestrian traffic.

---

[13] *Id.* at A38.
[14] *Id.* at A46.
[15] *Id.* at A45.

In any event, McDougal complied with Officer Moses's direction to sit down on the stoop, and further conversation between the two ensued. According to Officer Moses, this is when he first noticed a bulge in McDougal's "waistband area."[16] McDougal, who by this time was surrounded by as many as seven officers, denied that he was in possession of a weapon, specifically declined to consent to a pat-down search, and asked the officers why they were harassing him. Undeterred, Officer Moses grabbed the front of McDougal's blue jeans below the belt, but even then the officer "still didn't feel nothing."[17] Officer Moses asked McDougal why there was a bulge in his waistband. This prompted McDougal to remove an object—it appears to be a cloth facial mask—from the front pocket of his sweatshirt. Officer Moses then lifted McDougal's sweatshirt and reached down into his blue jeans and pulled out a pink handgun.[18] McDougal was immediately handcuffed and placed under arrest.

B

McDougal was charged with, and eventually indicted for, possession of a firearm by a person prohibited, possession of ammunition by a person prohibited,

---

[16] *Id*. at A36.
[17] *Id*.
[18] Officer Moses testified that, after he patted down the exterior of McDougal's blue jeans and "still didn't feel nothing," he "lifted up [McDougal's] shirt, and you could see the firearm in his waistband area." *Id*. The video evidence contradicts this account. It was only after Officer Moses lifted the shirt and put his hands down the front of McDougal's jeans and pulled them away from McDougal's waist that the firearm became visible.

8

and carrying a concealed deadly weapon. He moved to suppress the firearm that was taken from him on the grounds that the police did not have a reasonable suspicion that he was engaged in criminal activity when Officer Moses directed him to sit on the stoop. The State responded that "Officer Moses and the Wilmington [p]olice had reasonable articulable suspicion to stop, frisk and make inquiries from the defendant when they observed him loitering in the area where the confidential informant had given information that individuals had been selling street level drugs and carrying firearms."[19] At this juncture, the State described the stop as "a pedestrian stop to further investigate the information obtained from the informant that was corroborated through surveillance."[20] The State also described the area where McDougal was arrested as a "high crime area" where numerous firearm arrests had been made. This, according to the State's written response to McDougal's motion, coupled with McDougal's refusal to identify himself while acknowledging that he did not live in the area, provided a reason for Officer Moses "to deduce that [McDougal] may be in possession of a firearm."[21] The State did not mention McDougal's clothing in its written response.

---

[19] *Id.* at A20.

[20] *Id.* at A22. No evidence of corroboration of the informant's tip was adduced during the suppression hearing.

[21] *Id.* at A23.

Following the testimony of Officers Moses and Hunt at the suppression hearing, the State's argument to the trial court was, in a word, muddled. The prosecutor began her argument by asserting that Officer Moses had "a reasonable articulable suspicion to stop Mr. McDougal . . . ."[22] Indeed, she opined that, because the police had reports of criminal activity in the area and had observed that Coleman, Acklin, and McDougal "were standing out there for a good ten to 15 minutes[], . . . if they had wanted to issue a citation for loitering, they could have."[23] Alternatively, the State suggested that "the stop and then subsequent frisk was justified under *Terry* and resulting case law."[24] But when the court asked whether the initial encounter was an investigatory detention or a consensual encounter, the prosecutor took a different tack:

> I would say initially it's a consensual encounter because if you look at the encounter with the first two individuals, Hey, can we have your name, they give it to them. Can we pat you down, and they do. But Officer Hunt said if they had said no but at least gave their name and date of birth and we realize they don't have warrants, they sent them along their way. They don't arrest them. They don't give them a fine. They -- please, you know, they basically say don't come back here or you may get arrested. But that was the purpose in moving people along that day.

---

[22] *Id.* at A48.

[23] *Id.* at A49. We note that the only record evidence that supports the statement that the three men had been standing in the area for ten to fifteen minutes came from Officer Hunt and was based on his post-arrest review of surveillance video. At the suppression hearing, when asked by the court "how long were you, officers, in the area before you got out of the car and approached these individuals for loitering?" Officer Hunt responded "I don't think it was -- I think we pulled up and observed them standing at the intersection and then we got out and made contact." *Id.* at A40.

[24] *Id.* at A49.

10

So initially it is a consensual encounter. It was the conduct of Mr. McDougal and his actions and his clothing that cause them to investigate further, and then it became, you know, more of a stop.[25]

McDougal responded that the officers never asked or instructed him to move on, and therefore he was not loitering and could not be reasonably suspected of it. He noted that he had a right to refuse to answer the officer's questions in what, by then, the State had acknowledged was a consensual encounter. Implicit in this line of argument was that Officer Moses's order to McDougal that he sit down on the stoop was unjustified and that suspicion developed after that order should not be considered.

In rebuttal, the State added to its previously offered justifications for McDougal's detention, arguing that the loitering statute itself allows police to detain suspected loiterers to determine their identity.

C

Having heard the testimony of Officers Moses and Hunt and the argument of counsel, the Superior Court reserved decision. In a memorandum opinion and order issued a few weeks after the hearing, the court denied McDougal's motion. First, the court resolved the threshold issue of when McDougal's detention occurred. Noting that the State conceded that a detention had occurred when McDougal was ordered to sit down on the stoop but that McDougal claimed that the detention began

---

[25] *Id.*

upon the officers' initial approach, the court charted a middle course. The court rejected McDougal's position, finding that, "when the officers initially approached the group and simply asked for their names, it cannot reasonably be said that the individuals did not feel free to ignore the police presence."[26] The court found, however, that when Officer Moses told McDougal that "if he gave his name, he would be allowed to move along, a reasonable person in [McDougal's] shoes would not have [been] free to ignore the police presence, due to the officer's own words."[27] We take this to mean that, when the officer made this statement, McDougal was effectively seized within the meaning of Article I, § 6 of the Delaware Constitution.[28]

The court concluded that this seizure and the ensuing search of McDougal was justified by Officer Moses's reasonable articulable suspicion that McDougal was engaged in criminal activity. The court put it this way:

> Because Moses was investigating a potential violation of the loitering statute, 11 *Del. C.* § 1902[] allows further detention if Moses possessed a "reasonable ground to suspect" [McDougal] was "committing, has committed or is about to commit" that crime. In viewing the totality of the circumstances, Officer Moses' ability to articulate that three men were impeding the flow of pedestrian traffic, two of the three individuals did not live in the area and had no known lawful purpose to be there, the background information provided by the CI that street level drug sales were occurring at that location, as well as the observations of [McDougal's] baggy, layered clothes in which it

---

[26] *McDougal*, at *2.
[27] *Id.*
[28] *See Jones v. State*, 745 A.2d 856, 869 (Del. 1999) (determining "when a seizure has occurred under Article I, § 6 of the Delaware Constitution requires focusing upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence.").

12

appeared he was wearing two sets of pants, a "reasonable trained police officer in the same or similar circumstances" would be justified in suspecting criminal activity. Thus, he possessed reasonable, articulable suspicion at that point to detain [McDougal].[29]

The detention thus justified, the search of McDougal's person for weapons, according to the court, was permissible "under *Terry v. Ohio* and its Delaware progeny."[30] Hence, the Superior Court denied McDougal's motion to suppress.

D

In the wake of the Superior Court's denial of McDougal's motion to suppress, the parties agreed to a "stipulated" bench trial, that is, at trial, they "stipulate[d] to the facts and arguments presented in the suppression hearing."[31] McDougal agreed further that he was a person prohibited from possessing a firearm or ammunition because of a prior violent-felony conviction. The parties also stipulated that the firearm taken from McDougal was a fully functional 9mm handgun with a magazine containing eleven rounds of 9mm ammunition.

With these stipulations entered, the trial was, as intended by the parties, brief. Detective Moses laid the foundation for the admission in evidence of the 9mm handgun taken from McDougal and confirmed that the gun was concealed under McDougal's clothing. As anticipated, the court found McDougal guilty under all

---

[29] *McDougal*, at *3.
[30] *Id.*
[31] App. to Opening Br. at A56.

three counts of the indictment and immediately sentenced McDougal as described above. Two days later, McDougal filed this appeal.

E

McDougal challenges the Superior Court's denial of his motion to suppress on various grounds. His overarching theme is that the court erred when it found that the officers were permitted to detain him for failing to identify himself during what the State conceded was a consensual encounter. McDougal also contends that, even if his detention were lawful, Officer Moses's reaching inside his pants was not. Finally, McDougal argues that the State's reliance on the officers' purported suspicion of loitering is flawed because the officers failed to state with specificity the elements of the loitering violation that reasonably aroused their suspicion.

The State defends the Superior Court's denial of McDougal's motion, claiming that the officers had a reasonable articulable suspicion that McDougal was loitering. The State argues further that the loitering statute upon which the police relied required them to obtain McDougal's name and give him a warning before they could issue a citation. McDougal's refusal to provide his name, the State contends, justified the prolonging of his detention and the resultant pat-down.

II

We apply a mixed standard of review to a trial court's order denying a motion to suppress evidence after an evidentiary hearing.[32] "We review findings of fact for clear error, but we exercise *de novo* review over legal determinations."[33] "Once the historical facts are established, the legal issue is whether an undisputed rule of law is violated. Accordingly, this Court reviews *de novo* whether police possessed reasonable articulable suspicion to stop a person."[34]

III

A

"Generally speaking, investigative encounters between law enforcement and citizens fall within three categories: consensual encounters or mere inquiries, investigative detentions, and formal arrests."[35] A consensual encounter during which a police officer asks a citizen a question is not a seizure under the Fourth Amendment of the United States Constitution or Article I, § 6 of the Delaware Constitution. No level of suspicion is required to support a consensual encounter.[36]

An investigative detention, though a more limited intrusion in scope and duration than an arrest, nevertheless constitutes a seizure and is permissible only

---

[32] *Garnett v. State*, 308 A.3d 625, 641, 2023 WL 6987145, at *12 (Del. Oct. 24, 2023).
[33] *Id.*
[34] *State v. Rollins*, 922 A.2d 379, 382 (Del. 2007) (quoting *Purnell v. State*, 832 A.2d 714, 719 (Del. 2003)).
[35] *Diggs v. State*, 257 A.3d 993, 1003 (Del. 2021).
[36] *Id.* at 1003–04.

15

when there is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."[37] A classic formulation of the rule is that "law enforcement officers may stop or detain an individual for investigatory purposes, but only if the officer has reasonable articulable suspicion to believe the individual detained is committing, has committed, or is about to commit a crime."[38] This standard is codified in 11 *Del. C.* § 1902.[39]

During an investigative detention, if the officer encounters circumstances that support a reasonable belief that the detained person is armed, the officer may conduct a protective frisk for his safety.[40] But "an officer may not conduct a protective search for weapons without first having a reasonable articulable suspicion of criminal activity that supports an investigatory stop."[41]

In his concurring opinion in *Terry v. Ohio*, Justice Harlan articulated this principle so:

> [I]f the frisk is justified in order to protect the officer during an
> encounter with a citizen, the officer must first have constitutional

---

[37] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1287 (Del. 2008) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

[38] *Woody v. State*, 765 A.2d 1257, 1262 (Del. 2001) (citing *Terry v. Ohio*, 392 U.S. 11, 30 (1968); *Jones*, 745 A.2d at 860; and 11 *Del. C.* § 1902)).

[39] The relevant sections of 11 *Del. C.* § 1902 provide that "(a) [a] peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination. (b) Any person so questioned who fails to give identification or explain the person's actions to the satisfaction of the officer may be detained and further questioned and investigated."

[40] *Moore v. State*, 997 A.2d 656, 666 (Del. 2010).

[41] *Id.* at 666–67.

16

grounds to insist on an encounter, to make a forcible stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection. I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime.[42]

The Superior Court concluded that, when McDougal was told that he would be free to "move along" but only after providing his name, "a reasonable person in [McDougal's] shoes would not have [been] free to ignore the police presence, due to the officer's own words."[43]  We agree.  As of that moment, McDougal had been seized within the meaning of the Fourth Amendment and Article I, § 6.[44]  If that seizure was not based upon a reasonable articulable suspicion of unlawful activity, the evidence recovered as a result of the seizure—the firearm and ammunition—should have been deemed inadmissible at trial.[45]

---

[42] 392 U.S. at 32–33 (Harlan, J., concurring).

[43] *McDougal*, at *2.

[44] *See Brown v. Texas*, 443 U.S. 47, 50 (1979) (holding that "[w]hen the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment."); *Jones*, 745 A.2d at 869 ("[T]he question . . . of when a seizure has occurred under Article I, § 6 of the Delaware Constitution requires focusing upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence.  Under that analysis, Jones was seized within the meaning of Section 1902 when [the officer] first ordered him to stop and remove his hands from his pockets.").

[45] *Hall v. State*, 981 A.2d 1106, 1110 (Del. 2009) ("Under the exclusionary rule, 'the State may not use as evidence the fruits of a search incident to an illegal [seizure.]'") (quoting *Jones*, 745

17

B

A fundamental premise of both the State's and the trial court's reasoning and hence their conclusion that McDougal's detention was justified is that the arresting officers were "investigating a potential violation of the loitering statute."[46] Given the centrality of the crime of loitering to the State's argument, a review of our loitering statute is essential to our analysis.

The relevant portions of 11 *Del. C.* § 1321 provide that a person is guilty of loitering when

> (1) The person fails or refuses to move on when lawfully ordered to do so by any police officer; or
>
> (2) The person stands, sits idling or loiters upon any pavement, sidewalk or crosswalk, or stands or sits in a group or congregates with others on any pavement, sidewalk, crosswalk or doorstep, in any street or way open to the public in this State so as to obstruct or hinder the free and convenient passage of persons walking, riding or driving over or along such pavement, walk, street or way, and fails to make way, remove or pass, after reasonable request from any person; or
> . . .
>
> (6) The person loiters, congregates with others or prowls in a place at a time or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the

---

A.2d at 873); *see also Jones*, 745 A.2d at 869 ("If [a] seizure [is] not based upon reasonable and articulable suspicion, anything recovered as a result of that seizure is inadmissible at trial.").

[46] *McDougal,* at *3 ("Because Moses was investigating a potential violation of the loitering statute, 11 *Del. C.* § 1902[] allows further detention if Moses possessed a 'reasonable ground to suspect' [McDougal] was 'committing, has committed, or is about to commit' that crime."); *see also* Answering Br. at 2 ("The officers testified that they were investigating McDougal for violating the Delaware loitering statute.").

18

safety of persons or property in the vicinity, especially in light of the crime rate in the relevant area. Unless flight by the accused or other circumstances make it impracticable, a peace officer shall, prior to any arrest for an offense under this paragraph, afford the accused an opportunity to dispel any alarm which would otherwise be warranted, by requesting identification and an explanation of the person's presence and conduct. No person shall be convicted of an offense under this paragraph if the peace officer did not comply with the preceding sentence, or if it appears that the explanation given by the accused was true and, if believed by the peace officer at the time, would have dispelled the alarm.[47]

That Officer Moses did not have a firm grasp of the conduct that constitutes loitering under the statute is clear. As we mentioned above, when asked to describe the conduct giving rise to his suspicion of loitering, the officer said nothing more than that the three individuals—Acklin, Coleman, and McDougal were "[s]tanding idle at the intersection of 24[th] and Carter [Streets]."[48] That is not a crime. To be sure, Officer Hunt added that the three men were "blocking the flow of traffic on the sidewalk."[49] But that is not a crime either unless the person obstructing traffic "fails to make way, remove or pass, after reasonable request from any person . . . ."[50] No such request was made, which is not surprising, given the absence of any evidence

---

[47] The dissent notes that Officer Hunt also cited the City of Wilmington loitering ordinance in his police report. We in turn note that the State has argued that "[t]he record is clear that the officers relied on [a] Delaware state statute[,] 11 *Del. C.* § 1321, not a municipal ordinance." Answering Br. at 15–16. We do not see any difference between the statute and the ordinance that would affect our analysis.

[48] App. to Opening Br. at A38.

[49] *Id.* at A45.

[50] 11 *Del. C.* § 1321(2).

that there were any "persons walking, riding or driving over or along" the sidewalk. Very simply, Officer Moses could not have *reasonably* suspected that McDougal was loitering under subsections (1) or (2) of the loitering statute.

The State attempts to salvage its claim that McDougal was justifiably detained for loitering by pointing to the requirement in subsection (6) of the loitering statute that "a peace officer shall, prior to any arrest for an offense under this paragraph, afford the accused an opportunity to dispel any alarm which would otherwise be warranted, by requesting identification and an explanation of the person's presence and conduct." According to the State, this subsection *required* Officer Moses to request that McDougal identify himself and provided justification for his detention when he failed to do so. This reasoning is manifestly flawed; it assumes that Officer Moses had probable cause to arrest McDougal for loitering under subsection (6). But the suppression hearing record does not establish that the officers had knowledge of facts and circumstances based on reasonably trustworthy information that would justify a belief that McDougal was engaged in conduct "warrant[ing] alarm for the safety of persons or property in the vicinity . . . ."[51] At the point when Officer Morris told McDougal that he would be free to go his own way once he identified himself,

---

[51] 11 *Del. C.* § 1321(6); *see also State v. Maxwell*, 624 A.2d 926, 930 (Del. 1993) ("'Probable cause exists where 'the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information *[are] sufficient in themselves* to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.") (italics and brackets in original) (quoting *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)0.

McDougal had done nothing more than stand on a street corner while purportedly wearing baggy clothes.

C

In apparent recognition of Officer Moses's problematic suspicion of a loitering violation, the Superior Court relied on facts seemingly unrelated to Officer Moses's loitering rationale. Specifically, the court pointed to the weeks-old tip from the confidential informant, McDougal's "baggy" clothing, and the fact that neither Acklin or Coleman lived in the area of 24th and Carter Streets. These additional facts, viewed separately or together, do not create a reasonable ground to suspect that McDougal had committed or was about to commit a crime.

The several officers who descended upon the trio of men standing on the street corner themselves appeared to understand that the confidential informant's tip, which did not mention McDougal, was stale, unreliable, and insufficient to justify a detention of any of the three men. Indeed, they allowed Acklin and Coleman to go their own way after they had identified themselves. Likewise, the State conceded that, when the officers initially confronted Acklin, Coleman, and McDougal, the encounter was consensual, that is, it was not a detention based on reasonable suspicion or probable cause. As previously quoted, the State's prosecutor informed the Superior Court, "it [was] a consensual encounter [but that] it was the conduct of

21

Mr. McDougal and his actions and his clothing that cause[d] [the police] to investigate further, and then it became . . . a stop."[52]

Nor do we find that McDougal's clothing added anything substantial to the mix of information possessed by Officer Moses when he detained McDougal. We have reviewed the body-worn camera video, which shows that, until Moses began his pat-down by grabbing McDougal's crotch, McDougal's clothing—a red t-shirt, covered by a red sweatshirt, and blue jeans—was not extraordinary. And the State does not point us to anything Officer Moses could see before he ordered McDougal to sit on the stoop, other than McDougal's clothing, that would arouse a reasonable suspicion that McDougal was armed.

A more likely explanation for McDougal's detention was his failure to identify himself and consent to a pat-down search. Officer Moses admitted as much on cross-examination:

> Defense counsel: At some point, Officer, Mr. McDougal was asked to have a seat?
>
> Officer Moses: Yes, sir.
>
> Defense counsel: Was that because he would not give his name?

---

[52] App. to Opening Br. at A49. Indeed, we would expect that, had the officer harbored such a suspicion, he would not have directed McDougal to move voluntarily to "sit down . . . on the stoop," *id.* at A36, but would have immediately seized and frisked McDougal to protect himself and his fellow officers from possible danger.

Officer Moses:     Yes.[53]

It bears repeating here that Acklin and Coleman identified themselves and allowed the officers to conduct pat-downs, and they were not detained. But because Officer Moses did not, at the time he detained McDougal, have reason to suspect that McDougal had committed or was about to commit a crime, McDougal was free to decline to answer Officer Moses's questions and should have been allowed to go on his way.[54] The United States Supreme Court described the ramifications of such an encounter in *Florida v. Royer*:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.[55]

This Court echoed the *Royer* court in *Woody v. State*:

> [L]aw enforcement officers may approach and ask questions of an individual, without reasonable articulable suspicion that criminal activity is afoot. The individual, however, may not be detained and may

---

[53] *Id.* at A39.
[54] *See* 11 *Del. C.* § 1902; *Woody*, 765 A.2d at 1265.
[55] 460 U.S. 491, 497–98 (1983) (citations omitted).

walk or even run away. Refusal to answer the officer's inquiry cannot form the basis for reasonable suspicion.[56]

Faithful adherence to these principles permits but one conclusion here: detaining McDougal because of, to use the prosecutor's words, his "conduct . . . and his actions"—declining to answer Officer Moses's questions and to permit a pat-down search—violated McDougal's rights under both the Fourth Amendment of the United States Constitution and Article I, § 6 of the Delaware Constitution.

Finally, we are not persuaded that, as the Superior Court suggested, the fact that the police knew that Acklin and Coleman did not live "in the area and had no known lawful purpose to be there," contributed meaningfully to their suspicion that McDougal was subject to detention. Under the Fourth Amendment and Article I, § 6, a seizure—and an investigative detention is a seizure—is "ordinarily unreasonable in the absence of individualized suspicion of wrongdoing."[57] The Superior Court did not explain, nor has the State endeavored to clarify, how the residence of the two individuals whom the police did not detain raised an individualized suspicion of wrongdoing by McDougal.[58]

---

[56] *Woody*, 765 A.2d at 1265.

[57] *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000); *see also Juliano v. State*, 254 A.3d 369, 386 (Del. 2020) ("[E]ven 'purely pretextual' traffic stops must be supported by articulable individualized suspicion."); *Montgomery v. State*, 277 A.3d 1062,2020 WL 1672845, at *3 (Del. Apr. 3, 2020) (TABLE) ("In the absence of individualized articulable suspicion of wrongdoing, a search or seizure is ordinarily unreasonable.").

[58] *See Brown*, 443 U.S. at 49, 52 (concluding that the officer's belief that Brown "looked suspicious . . . and had never [been] seen in that area before" and testimony that the area had "a high incidence

IV

We conclude by addressing our dissenting colleagues' conclusion that six "uncontested facts sufficiently established reasonable articulable suspicion" that McDougal was loitering when he was seized.[59] First, the dissent mentions that "McDougal was 'blocking pedestrian traffic' by 'standing idle' in front of the house at 24th and Carter."[60] That, absent refusal to "move on" or "make way," is not loitering. Nor does the fact that "McDougal, unknown to the police, was with two individuals known not to live at that address" transform McDougal's otherwise innocuous conduct into loitering.[61] As for the informant's tip, the dissent does not address its obvious staleness and the absence of any testimony, save what the police had found in the area before receiving the tip, tending to establish indicia of the tip's reliability.[62] The dissent also points to the officers' discovery of a discarded firearm behind a trash can at 24th and Carter before they received the informant's tip. But the tip itself was at least two weeks old when Officer Moses seized McDougal, and the firearm discovery was a month before that.[63] Regarding McDougal's attire, we are simply unprepared to accept that McDougal's sweatshirt and blue jeans as plainly

---

of drug traffic" did not justify a reasonable suspicion that Brown was involved in a criminal activity.")

[59] Dissent at 20.

[60] *Id.*

[61] *Id.*

[62] *See Alabama v. White*, 496 U.S. 325, 328 (1990) ("[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge' . . . are . . . relevant in the reasonable-suspicion context.").

[63] App. to Opening Br. at A35.

depicted in the body-worn camera video "indicate[d] possession of a weapon," as suggested by Officer Moses and accepted by the dissent.

Finally the dissent notes that it is undisputed that "24th and Carter was a 'high crime' area."[64] We must acknowledge that "the crime rate in the relevant area" is a factor to be considered under subsection (6) of the loitering statute. But that factor only comes into play when the police encounter a "person [who] loiters, congregates with others or prowls at a time or in a manner not usual for individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity . . . ."[65] Our dissenting colleagues have not persuaded us that standing on a street corner with two friends or associates on a sunny April afternoon warrants such alarm. Absent conduct creating a reasonable suspicion of criminal activity, one does not forfeit constitutionally protected rights by living—or, for that matter being present—in a neighborhood where the crime rate is high.

V

For the reasons given, we conclude that the evidence seized from McDougal was the fruit of an unlawful seizure and should have been suppressed.[66] The exclusion of that evidence precludes a finding beyond a reasonable doubt that

---

[64] *Id.*

[65] 11 *Del. C.* § 1321(6).

[66] In light of this conclusion, we need not address McDougal's other grounds for reversal.

26

McDougal committed the crimes charged. Therefore, we reverse and vacate the Superior Court's judgment of conviction.

**VALIHURA, J. dissenting, joined by SEITZ, C.J.:**

Under Delaware and federal law, the State must have reasonable articulable suspicion that a crime is being committed in order to transform a consensual encounter into an investigative detention. This appeal considers whether the State established the requisite reasonable articulable suspicion that James McDougal ("McDougal") was loitering prior to his initial detention. I believe that the Superior Court correctly held that the officers had reasonable articulable suspicion that McDougal committed the crime of loitering before they directed McDougal to provide his name under 11 *Del. C.* § 1902(a).[1] Additionally, I believe that the Superior Court properly held that the pat down and search underneath McDougal's shirt was lawful. Because I would AFFIRM McDougal's conviction, I respectfully dissent.

## I. ANALYSIS

### A. Protections from Unreasonable and Warrantless Searches Generally

Under our United States and Delaware Constitutions, citizens have the right to be secure in their persons against unreasonable searches and seizures.[2] However, in certain

---

[1] *See generally State v. McDougal*, 2023 WL 2423233 (Del. Super. Mar. 7, 2023). This Court reviews a denial of a motion to suppress under the abuse of discretion standard. *Flowers v. State*, 195 A.3d 18, 23 (Del. 2018) (citing *Stafford v. State*, 59 A.3d 1223, 1227 (Del. 2012)). "When we are reviewing the denial of a motion to suppress evidence based on an allegedly illegal stop and seizure, 'we conduct a *de novo* review to determine whether the totality of the circumstances, in light of the trial judge's factual findings, support a reasonable and articulable suspicion for the stop.'" *Id.* (quoting *Lopez-Vazquez v. State*, 956 A.2d 1280, 1285 (Del. 2008)). "'We consider legal questions *de novo* and will uphold a trial court's factual findings unless they are clearly erroneous.'" *Womack v. State*, 296 A.3d 882, 889 (Del. 2023) (quoting *Lloyd v. State*, 292 A.3d 100, 105 (Del. 2023)).

[2] *Womack*, 296 A.3d at 889 ("Under the Fourth Amendment, '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]' Article I, § 6 provides that '[t]he people shall be secure in their persons, houses,

circumstances, more limited searches and seizures are found to be reasonable absent a warrant and absent probable cause.[3]  Those situations require officers to have reasonable articulable suspicion that a suspect has committed or is about to commit a crime.[4]

This Court described three types of interactions between law enforcement officers and citizens in *Diggs v. State*: "consensual encounters or mere inquiries, investigative detentions, and formal arrests."[5]  Consensual encounters occur when the officers initiate questioning,[6] but an individual may freely leave the encounter.[7]  In *Flowers v. State*, this Court identified investigative detentions and formal arrests as "'[t]wo categories of police-citizen encounters which constitute seizures under the Fourth Amendment[:]'"[8]

> First, police may "restrain an individual for a short period of time" to
> investigate where officers have "reasonable articulable suspicion that the

papers and possessions, from unreasonable searches and seizures[.]'" (alterations in original) (quoting U.S. Const. amend. IV; Del. Const. art. I, § 6)).

[3] *Flowers*, 195 A.3d at 23 ("Generally, [s]earches and seizures are *per se* unreasonable, in the absence of exigent circumstances, unless authorized by a warrant supported by probable cause." (internal citation and quotation marks omitted)).

[4] *Id.* (holding that the trial court properly found that the evidence supported the investigative detention and frisk of defendant after officer saw him grabbing a rectangular object from his waist and blading his body away from the officers in a high crime area late at night).

[5] *Diggs v. State*, 257 A.3d 993, 1003 (Del. 2021) (affirming denial of suppression motion because the initially consensual encounter, prompted by a tip, lawfully turned into an investigative detention based on reasonable articulable suspicion established when an individual threw items to the ground and took a defensive stance).

[6] *Id.* at 1003–04.

[7] *Williams v. State*, 962 A.2d 210, 214–15 (Del. 2008).

[8] *Flowers*, 195 A.3d at 24 (citations omitted).  *See also I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) ("The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 554 (1976) (holding vehicle stops at fixed border checkpoint for brief questioning was consistent with Fourth Amendment))); *Williams*, 962 A.2d at 215 (a consensual encounter where police ask questions "neither amounts to a seizure nor implicates the Fourth Amendment.").

2

suspect has committed or is about to commit a crime." It requires less than probable cause. This form of seizure is the *Terry* "stop," or investigative stop. For simplicity, we refer to such a seizure as a "stop" in this opinion. Second, the police seize a person when they make an arrest, which requires "probable cause that the suspect has committed a crime."[9]

One type of encounter may evolve into another.[10] At issue in this appeal is the transition from an initially consensual encounter to an investigative detention. "'Determining whether an officer had reasonable and articulable suspicion to conduct a stop requires a threshold finding of when the stop actually took place.'"[11] Once we make that determination, we must analyze what is constitutionally required at each stage of the encounter and evaluate whether those requirements were met based on the record evidence.[12]

Here, the evidence largely consists of what information Officer Leonard Moses ("Officer Moses") knew at the moment he requested McDougal's name and directed him to sit on the stoop. I believe that the Superior Court correctly held the detention occurred at that point and was lawful. Although Officer Moses attempted initially to consensually resolve his suspicion that McDougal was loitering, that consensual attempt did not negate

---

[9] *Flowers*, 195 A.3d at 24–25 (citations omitted). For the purposes of this opinion, I am calling Officer Moses's detention of McDougal an "investigative detention." I intend no distinction between an investigative stop and investigative detention.

[10] *See, e.g.*, *Diggs*, 257 A.3d at 1003–04 (transition from consensual encounter to investigative detention); *Flowers*, 195 A.3d at 24–26 (transition from investigative detention to arrest).

[11] *Flowers*, 195 A.3d at 26 (citations omitted).

[12] *See, e.g.*, *Diggs*, 257 A.3d at 1008 ("That these facts, viewed in their totality, justified Patrolman Shupe's investigative detention of Diggs seems evident to us. One simple way to reach that conclusion is to ask what Shupe was to do at each step along the way.").

the fact that based upon an objective view of the evidence, Officer Moses had a valid basis to detain McDougal when he directed McDougal to provide his name.

B. *The Initial Encounter Was a Consensual Encounter*

Of the three types of encounters, a consensual encounter is the least intrusive. Law enforcement officers may "['']initiate contact with citizens on the street for the purpose of asking questions.'"[13] In *Florida v. Royer*, a plurality of the United States Supreme Court stated that:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.[14]

During a consensual encounter, individuals approached by law enforcement officers may ignore their questioning, or leave without responding to it.[15] Refusal to answer questions, without more, does not justify further detention.[16] If the person refuses to

---

[13] *Williams*, 962 A.2d at 215 (citations omitted).

[14] *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion) (Justice White announced the judgment of the court and delivered an opinion joined by Justices Marshall, Powell, and Stevens, affirming the reversal below because the detective exceeded limits of investigatory stop. Justice Powell and Justice Brennan filed separate concurring opinions, Justice Blackmun filed a dissenting opinion, and Justice Rehnquist filed a dissenting opinion joined by Chief Justice Burger and Justice O'Connor). *See also Delgado*, 466 U.S. at 216 (7-2 decision) (observing that "our recent decision in Royer, supra, plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.").

[15] *Williams*, 962 A.2d at 215 ("During a consensual encounter, a person has no obligation to answer the officer's inquiry and is free to go about his business."). *See also Royer*, 460 U.S. at 497–98 ("The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." (citation omitted)).

[16] *Royer*, 460 U.S. at 498 ("He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." (citation omitted)).

answer, and the officers act further "to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure."[17]   Under Delaware law, "[a] person is 'seized' when, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"[18]   This Court analyzes when a seizure occurs by "focusing upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence."[19]

The evidence below suggests that Officer Moses attempted a consensual encounter when initially approaching McDougal.  While proactively patrolling the intersection of 24th Street and Carter Street ("24th and Carter") on April 13, 2022, Officer Moses, Officer Shauntae Hunt ("Officer Hunt") and other accompanying Wilmington Police Department officers observed three individuals "standing idle" "in front of the house[,]"[20] "blocking pedestrian traffic."[21]   The individuals at the intersection were McDougal, Rashad Acklin

---

[17] *Delgado*, 466 U.S. at 216–17 (citations omitted).

[18] *Flowers*, 195 A.3d at 24 (citations omitted) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (internal citations omitted)).  This standard was set forth by Justice Stewart in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), but in a part of that opinion joined only by Justice Rehnquist.  Three years later, a majority of the Court accepted the standard in *Royer*, 460 U.S. at 502.  This Court continues to follow this standard as articulated in *Jones v. State*, 745 A.2d 856, 862, 863–864, 868–69 (Del. 1999).

[19] *Jones*, 745 A.2d at 869.

[20] App. to Opening Br. at A38 (Officer Leonard Moses Motion to Suppress Hearing Testimony on Feb. 3, 2023 [hereinafter "Moses Test. at [_]"] at 20:20–21:1).  *See also McDougal*, 2023 WL 2423233, at *1.

[21] App. to Opening Br. at A45 (Officer Shauntae Hunt Motion to Suppress Hearing Testimony on Feb. 3, 2023 [hereinafter "Hunt Test. at [_]"] at 49:20–51:16).

("Acklin") and Jamir Coleman ("Coleman").[22] The officers considered this a high crime area.

Two weeks prior to the events at issue, a confidential informant told the police that four individuals used "ground stashes" in the area near 24th and Carter to conceal firearms from police.[23] A ground stash is a location where an individual "would place [a firearm] where they have direct control over it, but they are able to distance themselves from it if they think there's going to be police contact[.]"[24] Prior to the events involving McDougal and prior to receiving the tip, the police stopped two of the four individuals identified by the informant and discovered a firearm behind a trash can. Acklin and Coleman were the other two individuals named by the confidential informant.[25] Therefore, although the confidential informant was not past-proven, the police partially corroborated the information provided by the informant when they stopped Acklin, Coleman and McDougal.

The officers did not know McDougal, but they knew that Acklin and Coleman did not reside at this address.[26] After the officers observed the individuals standing at the

---

[22] *Id*. at A35, A36 (Moses Test. at 10:12–19, 12:17–13:5).

[23] *Id.* at A34–35 (Moses Test. at 6:23–8:16). McDougal was not named in the tip nor known to these officers prior to the events at issue.

[24] *Id.* at A34 (Moses Test. at 7:11–16).

[25] *Id*. at A35 (Moses Test. at 10:16–19). Acklin and Coleman consented to pat-down searches, and the officers recovered nothing. *Id.* at A40 (Moses Test. at 28:20–29:20) (Acklin); *Id.* at A44 (Hunt Test. at 44:7–16) (Coleman).

[26] *Id.* at A38 (Moses Test. at 21:7–9). McDougal was later found not to live at that residence. *Id.* at A42 (Moses Test. at 36:3–4).

6

intersection, the officers approached the individuals to ask them questions. Officer Hunt testified that when speaking with Coleman:

> I made contact with him, I -- I asked him if he lived in the area. He advised me that he did not. I asked him if I could pat him down. He gave me consent to do so. I asked him for his name and date of birth, and we were in the process of getting that information as well.[27]

Because Officer Hunt found no contraband, Officer Hunt told Coleman to "move on."[28] Officer Moses testified about his approach to McDougal:

> Well, during the initial contact I tried to identify myself, say who I am and who we are and why we're out here so it would explain that we're out here because you're loitering. And then I explained -- normally at that point people are, like, well, loitering ain't a big thing. And I'll explain to them, well, we got a lot of violence going on out here, this is one of the ways that we keep the violence down and ensure, that individuals that are standing out here on this corner are normally subject to being victims of just random violence, so we try and keep the area clear of people who's not supposed to be out there and don't live on the block.
>
> So I give them that briefing, and then during that briefing it would -- for his situation, because I had already seen some of the characteristics, I segued into, hey, during this contact do you mind if I pat you down just to ensure that I'm safe and you're safe during this encounter.[29]

---

[27] *Id.* at A44 (Hunt Test. at 44:5–10).

[28] *Id.* (Hunt Test. at 44:11–16). The same process occurred with Acklin. *Id.* at A36, A37, A38, A40 (Moses Test. at 12:12–16, 19:11–14, 20:6–15, 22:18–22, 28:20–29:20).

[29] *Id.* at A42 (Moses Test. at 36:15–37:12). Officer Moses also testified about the initial encounter in response to a question from the Superior Court:

> Well, I walked up to him and just introduced myself. I advised him, told him we have a tip. My normal spiel is, how you doing, you know, you not [sic] allowed to loiter, we got a lot of crime going on out here, we're just trying to keep the street safe. During that -- during that incident I think I segued into his clothing. I was identify-- I was seeing his clothing as I was approaching, and I went through that and was just asking, hey, do you mind if I pat you down, make sure you don't have any weapons or anything like that during this encounter, and he refused. I asked him for his name. He refused that also.

7

At this point, Officer Moses suspected that McDougal might have a firearm based on the "characteristics" of an armed gunman he learned through his training. Elaborating on what those characteristics were, Officer Moses stated "I mean, that he had that bagging [sic] clothing, asked him if he had any firearms on him, he said no. I asked him if I could pat him down, and he said no."[30] Officer Moses described the clothing as "baggy clothing with a -- looked to have multiple layers. Like he had, like, multiple pair of pants, or something like that, under his clothing."[31] He testified that in his training, he was taught a

> The engagement-- the encounter continued, and in my head I'm like, all right, I got all this previous information, I have a characteristic I know is consistent with a person that's -- that can conceal a firearm on their person, but I didn't think necessarily I was already there, so I asked him to -- I asked him to sit down while we was -- while we try to identify him and make it a safe encounter, at least safe for us and him, at least he's sitting down, he's not readily available to try and injure us, his hands are open, I could see.

*Id.* at A40 (Moses Test. at 30:2–31:2). During his testimony, Officer Moses explained some of the reasons behind loitering enforcement. *Compare id.* at A40, A42 (Moses Test at 30:4–7, 36:15–37:5), *with Miller v. State*, 922 A.2d 1158, 1162 n.8 (Del. 2007) (citing testimony by an officer that "individuals sometimes take up residence in a block or on a sidewalk that don't reside there, thus causing the neighbors some concern that the property may be damaged, cars might be broken into or engage in some type of drug activity or weapons activity."), *and id.* at 1162 ("[T]he police were aware of community concerns about weapons activity, drug dealing, and property damage caused by individuals who loitered but did not reside in the area.").

[30] App. to Opening Br. at A36 (Moses Test. at 13:17–20). *See also McDougal*, 2023 WL 2423233, at \*1 ("Moses contacted Defendant, explained to him his concerns about loitering in the area and asked Defendant if he was armed. Defendant replied that he was not and was asked if he would consent to a pat down. Defendant said he would not. Officer Moses then asked Defendant for his name and explained that the purpose was to identify him, so that he could be given his warning and 'be sent on his way.' Defendant refused to give Officer Moses his name. At that time, Moses instructed Defendant sit down on a nearby stoop out of concerns for officer safety, while he attempted to learn his identity.").

[31] App. to Opening Br. at A35 (Moses Test. at 11:10–12).

8

characteristic of an armed gunman is multilayer clothing to hide the "print" or outline of the gun.[32] The layers were unseasonable for the weather in April.[33]

Officer Moses asked McDougal for his name and McDougal refused to provide it. Officer Moses testified that he could not order McDougal to leave or issue a warning until he obtained his name because "that would be part of a warning."[34] The rationale for this practice is to avoid miscommunication and misidentifications at future stops.[35] According to Officer Moses, at this point, McDougal was "legally stopped for loitering."[36] Because McDougal refused to provide his name, Officer Moses ordered McDougal to take a seat on the stoop for officer safety while officers identified him.[37]

McDougal was free to leave until Officer Moses told McDougal that he could leave if he provided his name. The Superior Court correctly held that:

> [W]hen the officers initially approached the group and simply asked for their names, it cannot reasonably be said that the individuals did not feel free to ignore the police presence. This is further supported by the fact that the officers did not further question or ultimately detain Coleman and Acklin.
>
> However, at the point that Defendant was told that if he gave his name, he would be allowed to move along, a reasonable person in Defendant's shoes would not have [sic] free to ignore the police presence, due to the officer's own words.[38]

[32] *Id.* at A36, A37 (Moses Test. at 11:13–23); *McDougal*, 2023 WL 2423233, at *1.

[33] *McDougal*, 2023 WL 2423233, at *1 ("Officer Moses noted it was unseasonable attire for the weather and that it appeared Defendant was wearing multiple pairs of pants.").

[34] App. to Opening Br. at A37 (Moses Test. at 19:7–10).

[35] *Id* at A41 (Moses Test. at 33:16–34:3, 34:18–35:5). The police also check for warrants. *Id.* (Moses Test. at 35:8–13).

[36] *Id.* at A37 (Moses Test. at 19:22–23).

[37] *Id.* at A36, A39 (Moses Test. at 14:3–5, 27:15–19).

[38] *McDougal*, 2023 WL 2423233, at *2.

9

The Superior Court held, and I agree, that McDougal was initially free to leave and within his rights to refuse to answer questions. McDougal could and did reject Officer Moses's attempt to obtain consent to pat down McDougal. Once Officer Moses told McDougal he could move on if he provided his name, McDougal could no longer feel free to leave.[39] The Superior Court wrote "[i]t was only upon Defendant's refusal, coupled with the observation of his clothing and a concern for officer safety, did Officer Moses require Defendant to sit on the nearby stoop."[40] At this point, the attempted consensual encounter with McDougal became a detention. Thus, in order for this detention to be lawful, the State needed to establish reasonable articulable suspicion that McDougal had committed, was committing, or was about to commit some crime.

The Majority argues that Officer Moses obtained no new information during the consensual phase of this encounter, and therefore the State could not lawfully detain McDougal and establish that the officers had reasonable articulable suspicion that

---

[39] Officer Moses testified that:

> I believe I asked him, I gave him what my concerns were, explained to him that I thought, I mean, that he had that bagging [sic] clothing, asked him if he had any firearms on him, he said no. I asked him if I could pat him down, and he said no.

> At that point I asked him what his name was so I could get his name and then we'd identify him so we can give him his warning and then send him on his way, and the individual refused to give us his name.

> So after refusing to give us his name, to try and keep this as safe a situation as possible, I asked him to sit down. Upon having him sit down on the stoop, once he sat down, you could see an unusual bulge in his waistband area.

App. to Opening Br. at A36 (Moses Test. at 13:15–14:7).

[40] *McDougal*, 2023 WL 2423233, at *3.

10

McDougal was loitering. Based upon the record, including the State's position below, I would frame the issue differently.[41] The record suggests that the State never conceded that the officers could not have conducted an investigative detention of McDougal; the State only conceded, as the Superior Court found, that McDougal could no longer have felt free to leave when Officer Moses told McDougal that he could leave if he provided his name.[42]

Officer Moses lawfully conducted an investigative detention because there was at

---

[41] On appeal, the State argues:

> As such, even if the encounter may have had a consensual nature initially with some of the individuals, the State did not concede and the Superior Court did not accept, McDougal's claim that he was prevented from leaving a consensual encounter.
>
> Despite McDougal's contention, the State argued that, based on the evidence available to them, the officers had reasonable articulable suspicion to obtain McDougal's name, and, at that point, Officer Moses's words showed McDougal that he was not free to leave unless he provided his name.

Answering Br. at 25.

[42] *McDougal*, 2023 WL 2423233, at *2 ("[T]he State concedes that a detention occurred when Defendant was instructed to sit down on the stoop, therefore, the analysis is limited to Officer Moses' observations prior to that point and whether the initial questioning of Defendant constituted a seizure."). Below, the State argued the following at the hearing:

> I would say initially it's a consensual encounter because if you look at the encounter with the first two individuals, Hey, can we have your name, they give it to them. Can we pat you down, and they do. But Officer Hunt said if they had said no but at least gave their name and date of birth and we realize they don't have warrants, they sent them along their way. They don't arrest them. They don't give them a fine. They -- please, you know, they basically say don't come back here or you may get arrested. But that was the purpose in moving people along that day.
>
> So initially it is a consensual encounter. It was the conduct of Mr. McDougal and his actions and his clothing that cause them to investigate further, and then it became, you know, more of a stop.

App. to Opening Br. at A49 (Motion to Suppress Hearing Transcript from Feb. 3, 2023 [hereinafter "Hearing Trans. at [_]"] at 65:17–66:10). *See also id.* at A20 (Answer to Motion to Suppress at 8) ("Officer Moses and the Wilmington Police had reasonable articulable suspicion to stop, frisk and make inquiries from the defendant when they observed him loitering in the area where the confidential informant had given information that individuals had been selling street level drugs and carrying firearms.").

11

least reasonable articulable suspicion that the individuals were violating the loitering laws. Officer Moses attempted to resolve his reasonable articulable suspicion by initiating a consensual encounter and issuing a warning, even though, as he testified, McDougal "was legally stopped for loitering."[43] I believe the key is whether the State can establish that Officer Moses had reasonable articulable suspicion that McDougal was loitering at the point that McDougal could no longer believe he was free to leave. As the Superior Court found that point occurred when McDougal was told if he provided his name, he would be allowed to leave. I consider that question next.

### C. The State Established Reasonable Articulable Suspicion Justifying McDougal's Detention on the Stoop

An attempted consensual encounter can evolve into an investigative detention when "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"[44] In *Terry v. Ohio*, the United States Supreme Court held that an officer may only briefly detain or seize an individual for an investigative detention when the officer has *reasonable articulable suspicion* that "criminal activity may be afoot[.]"[45]

---

[43] App. to Opening Br. at A37 (Moses Test. at 19:22–23).

[44] *Flowers*, 195 A.3d at 24 (citations omitted) (quoting *Michigan*, 486 U.S. at 573 (internal citations omitted)).

[45] *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

In *Flowers*, this Court held that "[t]he State of Delaware has adopted [the holding in *Terry*], and Section 1902 of Title 11 governs such 'investigative' or *Terry* stops in this State."[46]  Under 11 *Del. C.* § 1902:

> (a) A peace officer may stop any person abroad, or in a public place, who the officer has *reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination*.

> (b) Any person so questioned who fails to give identification or explain the person's actions to the satisfaction of the officer *may be detained and further questioned and investigated.*

> (c) The total period of detention provided for by this section shall not exceed 2 hours.  The detention is not an arrest and shall not be recorded as an arrest in any official record.  At the end of the detention the person so detained shall be released or be arrested and charged with a crime.[47]

This Court interprets "reasonable ground" to mean "reasonable and articulable suspicion."[48]  As this Court held in *Diggs*: "'[a] determination of reasonable suspicion must be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts.'"[49]

---

[46] *Flowers*, 195 A.3d at 24.

[47] 11 *Del. C.* § 1902 (emphasis added).

[48] *Jones*, 745 A.2d at 861 ("Delaware has codified this standard for investigatory stops and detentions in 11 *Del. C.* § 1902.  For the purpose of this analysis, 'reasonable ground' as used in Section 1902(a) has the same meaning as reasonable and articulable suspicion.").

[49] *Diggs*, 257 A.3d at 1004 (citing *Jones*, 745 A.2d at 861).  The United States Supreme Court elaborated on the required totality of the circumstances analysis in *United States v. Cortez*:

> First, the assessment must be based upon all the circumstances.  The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers.  From these data, a trained officer draws inferences

13

Reasonable articulable suspicion requires "considerably less" than "proof by a preponderance of the evidence" and is "less demanding than probable cause[.]"[50]  It requires more than an inarticulate hunch and good faith by the officer.[51]

and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers.  Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

449 U.S. 411, 418 (1981).

[50] *Diggs*, 257 A.3d at 1004 ("This level of justification is often referred to as reasonable articulable suspicion and is considerably less than proof by a preponderance of the evidence and less demanding than probable cause, which is necessary to support an arrest." (internal quotation marks and citations omitted)).  The United States Supreme Court held the same in *U.S. v. Sokolow*:

The Fourth Amendment requires "some minimal level of objective justification" for making the stop.  That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence.  We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause[.]

490 U.S. 1, 7 (1989) (citations and quotations omitted).

[51] *Terry,* 392 U.S. at 22 ("Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.  And simple 'good faith on the part of the arresting officer is not enough.'" (citations and quotations omitted)). The Supreme Court observed in *Terry* that:

There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone.  Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs.  Store windows, moreover, are made to be looked in.  But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed

This Court held in *Lopez-Vazquez v. State*, that the following factors can contribute to finding reasonable articulable suspicion under the totality of the circumstances:

> [A]ctivity such as "leaving the scene upon the approach, or the sighting, of a police officer" or the "refusal to cooperate with an officer who initiates an encounter" cannot be the sole grounds constituting reasonable suspicion. These events, however, may be considered as part of the totality of the circumstances. Other circumstances may also be considered, such as the presence of a defendant in a high crime area, the defendant's "unprovoked, headlong flight," a defendant "holding a bulge in his pocket that appeared to be either a gun or a large quantity of drugs", [sic] a "focused" warning shout of police presence, or a furtive gesture after the officer's approach or display of authority. The officer's subjective interpretations and explanations of why these activities, based on experience and training, may have given him a reasonable suspicion to investigate further are also important, as is the trial judge's evaluation of the officer's credibility.[52]

I now look to the statutes to compare the elements of the loitering statutes with what information Officer Moses knew when he directed McDougal to provide his name.[53] There are two relevant statutes – 11 *Del. C.* § 1321, ("Section 1321") and Section 36-68, the City

---

> immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further.

*Id.* at 22–23.

[52] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1288–89 (Del. 2008) (citations and quotations omitted).

[53] Officer Moses testified, and the Superior Court held, that he was investigating loitering. App. to Opening Br. at A37, A42 (Moses Test. at 19:22–23, 36:15–18); *McDougal*, 2023 WL 2423233, at *1 ("Moses contacted Defendant, explained to him his concerns about loitering in the area and asked Defendant if he was armed."); *id.* at *3 ("Because Moses was investigating a potential violation of the loitering statute, 11 *Del. C.* § 1902, allows further detention if Moses possessed a 'reasonable ground to suspect' Defendant was 'committing, has committed or is about to commit' that crime." (quoting 11 *Del. C.* § 1902(a))).

15

of Wilmington Ordinance on Loitering ("Section 36-38") –that set forth the elements of the crime of loitering.

Under Section 1321 a person is guilty of loitering when:

(1) The person fails or refuses to move on *when lawfully ordered to do so by any police officer*; or

(2) The person stands, sits idling or loiters upon any pavement, sidewalk or crosswalk, or stands or sits in a group or congregates with others on any pavement, sidewalk, crosswalk or doorstep, in any street or way open to the public in this State *so as to obstruct or hinder the free and convenient passage of persons* walking, riding or driving over or along such pavement, walk, street or way, *and fails to make way*, remove or pass, *after reasonable request* from any person; or

(3) The person loiters or remains in or about a school building or grounds, not having reason or relationship involving custody of or responsibility for a pupil or any other specific or legitimate reason for being there, unless the person has written permission from the principal; or

(4) The person loiters, remains or wanders about in a public place for the purpose of begging; or

(5) The person loiters or remains in a public place for the purpose of engaging or soliciting another person to engage in sexual intercourse or deviate sexual intercourse; or

(6) The person loiters, congregates with others or prowls *in a place at a time or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity, especially in light of the crime rate in the relevant area.* Unless flight by the accused or other circumstances make it impracticable, a *peace officer shall, prior to any arrest for an offense under this paragraph, afford the accused an opportunity to dispel any alarm which would otherwise be warranted, by requesting identification and an explanation of the person's presence and conduct.* No person shall be convicted of an offense under this paragraph if the peace officer did not comply with the preceding sentence, or if it appears that the explanation given by the accused was true and, if believed by the peace officer at the time, would have dispelled the alarm.

16

Loitering is a violation.[54]

Although defense counsel and Superior Court discussed Section 1321 at the hearing,[55] Officer Hunt quoted a different provision in the police report.[56] Officer Hunt quoted to Section 36-68:

(a) *Definitions.* The following words, terms and phrases, when used in this section, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Public place* means an area generally visible to public view and including streets, sidewalks, bridges, alleys, plazas, parks, driveways, parking lots, automobiles, while moving or not, within 50 feet of buildings which are single-family or multifamily residences, or which are open to the general public and which serve food or drink for consumption on or off the premises, or which provide entertainment, and the doorway and entrances to such buildings and the grounds enclosing them, or any other area either publicly owned or to which the public has access or any vacant property in either a residential or commercial district as designated by section 48-96 of this Code.

(b) *Prohibited behavior.* A person is guilty of loitering under this section when, within *50 feet of a single-family or multifamily residence,* or within 50 feet of a business which is open to the general public and which serves food or drink for consumption on or off the premises or which provides entertainment, or within 50 feet of any vacant property in either a residential or commercial district:

(1) The person fails or refuses to move on *when lawfully ordered to do so by any police officer*;

(2) The person stands, sits idly or loiters upon any pavement, sidewalk or crosswalk, or stands or sits in a group or congregates with others on any pavement, sidewalk, crosswalk, or doorstep, in any street or way open to the public in this city *so as to obstruct or hinder the free and convenient passage of other persons* walking, riding or driving

---

[54] 11 *Del. C.* § 1321 (emphasis added).

[55] App. to Opening Br. at A45 (Hunt Test. at 49:20–51:16).

[56] Reply Br. at Ex. A.

over or along such pavement, walk, street or way, and *shall fail to make way*, remove or pass, *after reasonable request* from any other person;

(3) The person loiters or remains in a public place for the purpose of solicitation as set forth in section 36-93; or

(4) The person loiters, prowls, wanders or creeps *in a place at a time or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity*. Unless flight by the accused or other circumstances make it impracticable, *a police officer shall, prior to any arrest for an offense under this subsection, afford the accused an opportunity to dispel any alarm which would otherwise be warranted, by requesting him to identify himself and explain his presence or conduct*. No person shall be convicted of an offense under this subsection if the police officer did not comply with the preceding sentence, or if it appears that the explanation given by the accused was true and, if believed by the police officer at the time, would have dispelled the alarm.

(c) *Notice to the public.* The owner or proprietor of any business which is included within the provisions of this section shall post a sign or signs in the business premises which shall clearly state for customers to read the prohibition of loitering under this section and the penalties for violation thereof.

(d) *Penalties.* Any person who violated the provisions of this section shall be fined $100.00 for his first offense, $250.00 for a second offense, $450.00 for a third offense, and $500.00 for every subsequent offense. These fines shall not be subject to suspension or reduction for any reason. The current offense shall be considered a subsequent offense to any offense or offenses for the same violation which have occurred within the past five years.[57]

The police report states that "[t]he above listed information was referenced from the

Delaware State Code and the City of Wilmington Code."[58] This statement indicates an

---

[57] Wilm. C. § 36-68 (emphasis added) (subsection title emphasis in original).

[58] Reply Br. at Ex. A.

attempt to reference both statutes, rather than rely only on Section 36-68 as McDougal suggests. McDougal argues that the State failed to name with specificity which provision formed the basis of Officer Moses's investigation and therefore the State lacked reasonable articulable suspicion to detain McDougal. This lack of specificity as to which of the two substantially similar statutes was at issue does not invalidate the detention. 11 *Del. C.* § 1902 required only that Officer Moses have reasonable ground to suspect McDougal "is committing, has committed or is about to commit *a crime*[.]"[59]

In *Miller v. State*, this Court held that the police established reasonable articulable suspicion to detain an individual for loitering under 11 *Del. C.* § 1321(6) when they observed an individual "sit on the step of the vacant business for twenty to thirty minutes; the vacant building was formerly used in an illegal bookmaking operation; it was 9 p.m., and the general area was known for drug problems and other criminal activity."[60]

Similarly, at the time Officer Moses directed McDougal to provide his name, the officers knew information from the confidential informant and their observations that

---

[59] 11 *Del. C.* § 1902(a) (emphasis added).

[60] *Miller*, 922 A.2d at 1162–63. The Court in *Miller* also held:

> Although the Delaware statute does not generally define loitering, a common definition of the word "loiter" is "to remain in an area for no obvious reason." A reasonable, trained police officer, viewing a person sitting on the steps of a vacant building at night for an extended period of time doing nothing, would have a reasonable and articulable suspicion that the person was loitering. Accordingly, in accordance with Delaware's loitering statute, such activity would warrant a brief detention to investigate or warn the person to move on.

*Id.* at 1162 (citations omitted).

implicated many of the elements of Section 1321 and Section 36-38. The following facts establish reasonable articulable suspicion that McDougal was violating a loitering statute:

- McDougal was "blocking pedestrian traffic" by "standing idle" "in front of the house" at 24th and Carter; [61]

- McDougal, unknown to the police, was with two individuals known not to live at that address;[62]

- Officers were investigating a tip by a confidential informant which indicated that McDougal's companions and two other individuals used ground stashes in this area to hide drugs and guns;[63]

- Prior to receiving that tip, officers stopped the other two individuals identified by the confidential informant around the area of 24th and Carter and "located a discarded firearm behind a trash can;"[64]

- 24th and Carter was in a "high crime" area; [65]

- McDougal was dressed in baggy and multiple-layered clothing, inappropriate for the season, which was a characteristic known from police training and experience to indicate possession of a weapon (for example, by hiding the "print" of a gun).[66]

The above uncontested facts sufficiently established reasonable articulable suspicion of loitering. Officer Moses observed the individuals and their position relative to the residence at 24th and Carter. The confidential informant's tip was relevant to

---

[61] App. to Opening Br. at A38, A45 (Moses Test. at 20:20–21:1; Hunt Test. at 51:9–51:16). *See also McDougal*, 2023 WL 2423233, at *1.

[62] App. to Opening Br. at A38, A41 (Moses Test. at 21:7–9, 35:16–19).

[63] *Id.* at A34–35 (Moses Test. at 6:23–8:16).

[64] *Id.* at A35 (Moses Test. at 8:17–21); *McDougal*, 2023 WL 2423233, at *1.

[65] App. to Opening Br. at A39 (Moses Test. at 25:7–8).

[66] *Id.* at A35 (Moses Test. at 11:10–12) ("baggy clothing with a – looked to have multiple layers. Like he had, like, multiple pair of pants, or something like that, under his clothing."); *id.* (Moses Test. at 11:16–23) (baggy clothing hides weapons); *McDougal*, 2023 WL 2423233, at *1.

whether McDougal's behavior was "not usual for law-abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity[,]"[67] "especially in light of the crime rate in the relevant area."[68] Although reasonable articulable suspicion requires more than a hunch,[69] it also requires "considerably less" than "proof by a preponderance of the evidence" and is "less demanding than probable cause[.]"[70] What Officer Moses knew prior to detaining McDougal may amount to less than proof by preponderance of the evidence but was sufficiently more than a hunch that one of the provisions was violated. Even if Officer Moses initially attempted to resolve the loitering violation through a consensual encounter, that does not negate the existence of reasonable articulable suspicion to detain McDougal at the time that Officer Moses ordered McDougal to provide his name. Therefore, I believe that the Superior Court correctly held that the State had a valid basis to detain McDougal because the State established that Officer Moses had reasonable articulable suspicion that McDougal committed the crime of loitering.[71]

---

[67] 11 *Del. C.* § 1321(6); Wilm. C. § 36-68(4).

[68] 11 *Del. C.* § 1321(6).

[69] *Terry,* 392 U.S. at 22 (citations omitted).

[70] *Diggs*, 257 A.3d at 1004 (internal quotation marks and citations omitted).

[71] The Superior Court held:

> 14. Because Moses was investigating a potential violation of the loitering statute, 11 *Del. C.* § 1902, allows further detention if Moses possessed a "reasonable ground to suspect" Defendant was "committing, has committed or is about to commit" that crime. In viewing the totality of the circumstances, Officer Moses' ability to articulate that the three men were impeding the flow of pedestrian traffic, two of the three individuals did not live in the area and had no known lawful purpose to be there, the background information provided by the CI that street level drug sales were occurring at that location, as well as the observations of Defendant's

Because Officer Moses had a reasonable articulable suspicion that McDougal committed a loitering violation, he could detain McDougal pursuant to 11 *Del. C.* § 1902(a) and request his name, address, and business abroad. Because McDougal did not provide his name, Officer Moses could then detain McDougal pursuant to 11 *Del. C.* § 1902(b) to question McDougal and further investigate the reasonable articulable suspicion of loitering. This detention had to be under two hours and limited to the purpose of the stop pursuant to 11 *Del. C.* § 1902(c). The nature of the detention itself, asking McDougal to sit on the stoop, was "limited, justified at its inception, and 'reasonably related in scope to the circumstances which justified the interference in the first place.'"[72] Therefore, the Superior Court correctly concluded that the officers lawfully detained McDougal.

### D. *The State Needed Reasonable Articulable Suspicion That McDougal was Armed and Presently Dangerous to Pat Him Down for Weapons*

As required under Delaware law, the State established reasonable articulable suspicion that McDougal was armed and presently dangerous to Officer Moses and others prior to patting down McDougal. Therefore, I believe the pat down was lawful.

---

baggy, layered clothes in which it appeared he was wearing two sets of pants, a "reasonable trained police officer in the same or similar circumstances" would be justified in suspecting criminal activity. Thus, he possessed reasonable, articulable suspicion at that point to detain Defendant.

15. Accordingly, no violation under either Article I, § 6 of the Delaware Constitution, or the Fourth Amendment of the United States Constitution occurred when the officers approached, and eventually detained Defendant.

*McDougal*, 2023 WL 2423233, at *3 (quoting 11 *Del. C.* § 1902(a)).

[72] *Flowers*, 195 A.3d at 25 (quotation and citations omitted).

22

On appeal, the State asserts that McDougal waived any claim that the pat down was unlawful. At the suppression hearing, McDougal's attorney confirmed he did not challenge the retrieval of the gun. The State argues that this was a strategic decision of trial counsel, which precludes appellate review under our Supreme Court Rule 8.[73] Because McDougal's trial counsel did not challenge,[74] and the Superior Court did not analyze whether the pat down was lawful, the plain error standard applies.[75]

In *Flowers*, this Court articulated the standard for when an officer may pat down an individual during an investigative detention:

> "During a *Terry* stop, officers may take measures that are reasonably necessary to protect themselves and maintain the status quo." A police officer is empowered to "take necessary measures to determine whether [an individual] is in fact carrying a weapon and to neutralize the threat of physical harm" when the officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others."
>
> During an investigative stop, officers may, under appropriate circumstances, search the detainee to determine whether he is armed. An officer may conduct such a search for weapons if "he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." The search must be strictly circumscribed by the exigencies that justify its initiation.[76]

---

[73] Del. Supr. Ct. R. 8.

[74] App. to Opening Br. at A50 (Hearing Trans. at 71:3–6) ("Certainly when an officer sees a bulge, that's when Mr. McDougal is sitting down. Obviously I can't contest the case law when the officer sees a bulge.").

[75] This Court considers arguments not raised below under a plain error standard of review. A plain error is "[']so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process . . . [and is a] material defec[t] which [is] apparent on the face of the record [and is] basic, serious and fundamental. . . .'" *El-Abbadi v. State*, – A.3d –, –, 2024 WL 14537, at *20 (Del. Jan. 2, 2024) (alterations in original) (quoting *Williams v. State*, 796 A.2d 1281, 1284 (Del. 2002)).

[76] *Flowers*, 195 A.3d at 28 (citations and quotations omitted).

Regarding the scope of the search, "[t]he form of 'search' deemed 'reasonable' under such circumstances is also a limited one: a 'frisk' or pat down to find weapons."[77] A pat down must be "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search, even though it remains a serious intrusion."[78]

The State established, under the totality of the circumstances, that Officer Moses had reasonable articulable suspicion to believe that he was dealing with an "armed and presently dangerous" person.[79] At the hearing below, Officer Moses testified that he saw an "unusual bulge" in McDougal's waist area when McDougal sat on the stoop.[80] Officer Moses asked McDougal about the bulge, and McDougal removed "some articles" out of his pocket; however, the bulge remained.[81] Officer Moses observed McDougal's multiple layers of clothing and knew that to be a characteristic of an individual concealing a firearm. Officer Moses also knew from his training and experience that the bulge was at McDougal's waist where a person might conceal a firearm. Therefore, the State established that Officer Moses had reasonable articulable suspicion that McDougal was armed and presently dangerous prior to patting down McDougal.[82] Thus, I believe there was no error

---

[77] *Id.* at 25–26 (citing *Terry*, 392 U.S. at 26).

[78] *Terry*, 392 U.S. at 26. *See also Royer*, 460 U.S. at 498 ("[T]he search must be limited in scope to that which is justified by the particular purposes served by the exception.").

[79] *Flowers*, 195 A.3d at 28 (citing *Terry*, 392 U.S. at 24).

[80] App. to Opening Br. at A36 (Moses Test. at 14:5–7).

[81] *Id.* (Moses Test. at 14:12–15:4). *See also McDougal*, 2023 WL 2423233, at *2 ("Defendant was asked about the bulge and in response pulled out a medical facemask and a hair cap.").

[82] *Terry*, 392 U.S. at 27 ("And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or

when Superior Court held, even without additional analysis, that "Officer Moses appropriately engaged in the pat down of Defendant once on the stoop[.]"[83]

Finally, McDougal's argument that Officer Moses searched McDougal beyond the permitted scope of a pat down has no merit. Officer Moses testified as follows on direct examination:

Q. When you say you reached down, could you describe more of what you do? Are you going in his pants? Are you going over the top of his pants to feel it? What are you doing?

A. I believe what happened is I reached down and I was patting it down, and then still didn't feel nothing, and I lifted up his shirt, and you could see the firearm in his waistband area.

Q. Okay. So when you pat, could you still feel something?

A. Yes.

Q. All right. And because you felt something, then you lifted his shirt?

A. Correct.[84]

Although Officer Moses initially stated he felt nothing, when the State specifically asked him if he felt something, he altered his answer. McDougal's trial counsel did not cross-examine Officer Moses regarding that initial description of the pat down. The Superior Court was in a better position to determine Officer Moses's credibility, having observed Officer Moses's body language and tone during his testimony, and then by

---

'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." ).

[83] *McDougal*, 2023 WL 2423233, at *3.

[84] App. to Opening Br. at A36–37 (Moses Test. at 15:16–16:6).

25

comparing that testimony to what the judge saw when reviewing the body camera footage. The Superior Court did not make a finding of fact regarding whether Officer Moses felt anything:

> Upon being placed on the stoop, Officer Moses observed a "unusual" bulge in Defendant's waistband. Defendant was asked about the bulge and in response pulled out a medical facemask and a hair cap. The bulge was still present, so *Officer Moses conducted a pat down of Defendant*. During the pat down, a loaded pink and black 9mm firearm was located in his clothes at his waistband.[85]

The lack of argument by trial counsel and lack of finding of fact by the Superior Court suggests that the parties and court were satisfied that the pat down was conducted properly. It also suggests that the parties and the court understood that Officer Moses corrected himself in his testimony. I see no error in the result, and if there were an error, it was not "[']so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process . . . [and is a] material defec[t] which [is] apparent on the face of the record [and is] basic, serious and fundamental. . . .'"[86] Accordingly, I believe that McDougal has not satisfied the plain error standard.

## II. CONCLUSION

Our law enforcement officers must follow proper procedural safeguards and satisfy the requisite standard during each step of their investigation from consensual encounter to arrest. This ensures that law enforcement officers can investigate efficiently, and simultaneously protects the paramount constitutional rights of Delawareans. I believe that

---

[85] *McDougal*, 2023 WL 2423233, at *2 (emphasis added).

[86] *El-Abbadi*, 2024 WL 14537, at *20 (alterations in original) (citation omitted).

26

the Superior Court correctly determined that the State justified both detaining McDougal and conducting the pat down with the required reasonable articulable suspicion. Therefore, I would AFFIRM McDougal's conviction and accordingly, I respectfully DISSENT.